**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

|  |  |  |
|---|---|---|
| BORÇELIK ÇELIK SANAYII TICARET A.Ş.; ARCELORMITTAL ÇELIK TICARET A.Ş.; BAMESA CELIK SERVIS SAN. VE TIC. A.Ş.; AND BAMESA MURADIYE DEMIR ÇELIK SAN. VE TIC. A.Ş., | ) ) ) ) ) ) ) | |
| *Plaintiffs,* | ) ) | |
| *and* | ) ) | |
| YILDIZ DEMIR ÇELIK SANAYI A.S.; YILDIZ ENTEGRE AGAÇ SANAYI VE TICARET A.S.; STEEL DYNAMICS, INC.; AND UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, | ) ) ) ) ) ) ) ) ) ) | Consol. Court No. 26-00722 |
| *Consolidated Plaintiffs,* | ) ) | |
| *and* | ) ) | |
| UNITED STATES STEEL CORPORATION AND NUCOR CORPORATION, | ) ) ) | |
| *Plaintiff-Intervenors,* | ) ) | |
| *v.* | ) ) | |
| UNITED STATES, | ) ) | |
| *Defendant,* | ) ) | |
| *and* | ) ) | |
| STEEL DYNAMICS, INC.; UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, | ) ) ) ) ) | |

**PUBLIC VERSION**
Business proprietary information
deleted from pages 4, 26-28, 34-38,
40.

AFL-CIO, CLC; UNITED STATES            )
STEEL CORPORATION; NUCOR               )
CORPORATION; BORÇELIK ÇELIK            )
SANAYII TICARET A.Ş.;                  )
ARCELORMITTAL ÇELIK TICARET A.Ş.;      )
BAMESA CELIK SERVIS SAN. VE TIC.       )
A.Ş.; AND BAMESA MURADIYE DEMIR        )
ÇELIK SAN. VE TIC. A.Ş.,               )
                                       )
                _Defendant-Intervenors._      )
_____ )

## CONSOLIDATED PLAINTIFFS' AND PLAINTIFF-INTERVENORS' RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

| | | |
|---|---|---|
| Roger B. Schagrin | Alan H. Price | Thomas M. Beline |
| Jeffrey D. Gerrish | Christopher B. Weld | Myles S. Getlan |
| Maliha Khan | Stephanie M. Bell | Mary Jane Alves |
| Nicholas C. Phillips* | WILEY REIN LLP | Roop K. Bhatti |
| SCHAGRIN ASSOCIATES | 2050 M Street NW | Nicole Brunda |
| 900 Seventh Street, N.W., | Washington, D.C. 20036 | Margaret E. Monday |
| Suite 500 | | CASSIDY LEVY KENT (USA) LLP |
| Washington, DC 20001 | | 2112 Pennsylvania Avenue, N.W., |
| | | Suite 300 |
| | | Washington, D.C. 20037 |

_Counsel to Steel Dynamics, Inc. and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC_

_Counsel to Nucor Corporation_

_Counsel to United States Steel Corporation_

July 10, 2026

*Only admitted in New York. Practice limited to federal courts and agencies.

TABLE OF CONTENTS

I.    RULE 56.2 STATEMENT AND SUMMARY OF ARGUMENT ...................................... 1

   A.  Administrative Determination For Which Review Is Sought............................................. 1

   B.  Issues Presented and Summary of Arguments................................................................... 1
      1. Whether Commerce's failure to "zero" Borcelik's U.S. sales made above normal value
      was contrary to law ............................................................................................................... 1
      2. Whether Commerce's decision to apply an AFA adjustment to Borcelik's home market
      freight expenses that rewarded Borcelik's non-cooperation was unsupported by
      substantial evidence and not in accordance with law ......................................................... 2
      3. Whether Commerce's deduction of internal stock transfers from Borcelik's finished
      goods inventory balance was unsupported by substantial evidence and not in accordance
      with law................................................................................................................................ 3
      4. Whether Commerce erred in accepting YDC's unverifiable depreciation methodology
      and distorted gross-production cost database ..................................................................... 3
      5. Whether Commerce's reversal of its preliminary date of sale determination was
      unsupported by substantial evidence and not in accordance with law................................. 4

II.   STATEMENT OF FACTS ................................................................................................... 5

III.  STANDARD OF REVIEW ............................................................................................... 10

IV.   ARGUMENT...................................................................................................................... 11

   A.  Commerce's Failure to Treat Borcelik's Non-Dumped Sales as Having No or Zero
     Dumping Margins Is Contrary to Law.............................................................................. 11
     1. Legal Background............................................................................................................ 12
     2. The Antidumping Statute Is Best Read to Require Zeroing ........................................... 15
       a) 19 U.S.C. §1677(35)(A)-(B) Require Zeroing......................................................... 15
       b) 19 U.S.C. §1677f-1(d) Requires Zeroing................................................................. 17

   B.  Commerce Erred in Its Selection of AFA for Borcelik's Home Market Inland Freight
     Expenses .......................................................................................................................... 20
     1. Legal Background............................................................................................................ 22
     2. Commerce's Choice of AFA Violated the Purpose of the AFA Statute........................ 23

   C.  Commerce's Treatment of Borcelik's Internal Stock Transfers Was Unsupported by
     Substantial Evidence and Not in Accordance with Law................................................... 25

   D.  Commerce's Cost Determinations With Respect to YDC Are Unsupported by Substantial
     Evidence and Not in Accordance With Law..................................................................... 28
     1. Commerce Erred in Concluding That YDC's Reported Depreciation Expense
     Reflected Inflation-Adjusted Asset Values......................................................................... 29
     2. Commerce Erred in Determining That YDC Appropriately Included Semi-Finished
     Goods in Its Cost Database................................................................................................. 32
       a) YDC Improperly Reported Gross Production that Included Both Final
       Merchandise and SFG ..................................................................................................... 33
       b) The Inclusion of SFG Distorted YDC's Costs........................................................... 36
       c) Commerce's Cost Determinations Are Contrary to Law............................................ 39

E.  Commerce's Date-of-Sale Determination Is Unsupported by Substantial Evidence and Contrary to Law ......................................................................................... 42

1. The Pro-Forma Invoice Date Was the Proper Date of Sale ......................................... 43

2. A Single Tolerance-Level Adjustment Was Not Sufficient to Deviate from the Pro-Forma Invoice Date .................................................................................................. 44

V.  CONCLUSION ............................................................................................................. 46

## TABLE OF AUTHORITIES

**Cases**

*Allied Tube & Conduit Corp. v. United States*,

374 F. Supp. 2d 1257, 1261 (Ct. Int'l Trade 2005) ...................................................... 43

*Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004)................................... 11

*Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*,

624 F. Supp. 3d 1343, 1377 (Ct. Int'l Trade 2023) ............................................ 23, 24

*Bowe Passat Reingungs-Und Waschere-itechnik GmbH v. United States*,

926 F. Sup. 1138 (Ct. Int'l Trade 1996) ................................................................ 13

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*,

419 U.S. 281, 290 (1974)..................................................................................... 46

*Ceramica Regiomontana, S.A. v. United States*,

810 F.2d 1137, 1139 (Fed. Cir. 1987)................................................................... 11

*Chevron, U.S.A. Inc. v. Natural Res. Def. Council Inc.*,

467 U.S. 837, 104 S. Ct. 2778 (1984)................................................................... 11

*Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938) ................................................ 10

*Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).............................................. 45

*Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1276 (Fed. Cir. 2012) ...................... 23

*F. Ili De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*,

216 F.3d 1027, 1032 (Fed. Cir. 2000).................................................................... 23

*FCC v. NextWave Pers. Commc'ns, Inc.*, 537 U.S. 293, 300 (2003) ............................ 12

*Ferrostaal Metals GmbH v. United States*,

518 F. Supp. 2d 1353, 1362 (Ct. Int'l Trade 2007) ................................................ 45

*Garg Tube Export LLP v. United States*,

569 F.Supp.3d 1202, 1215 (Ct. Int'l Trade 2022) ................................................. 32

*Glycine & More, Inc. v. United States*, 880 F.3d 1335, 1345 (Fed. Cir. 2018) ............. 43

*Hangzhou Spring Washer Co. v. United States*,

387 F. Supp. 2d 1236, 1245 (Ct. Int'l Trade 2005) ............................................... 44

*HiSteel Co., Ltd. v. United States*, 547 F.Supp.3d 1233, 1241 (Ct. Int'l Trade 2021) ................ 32

*Hyundai Steel Co. v. United States*, 319 F.Supp.3d 1327, 1345 (Ct. Int'l Trade 2018)............... 32

*Jacobi Carbons AB v. United States*, 222 F. Supp. 3d 1159, 1171 (Ct. Int'l Trade 2017)........... 45

*Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004)......................................................................... 17

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) ......................................... 11, 15, 16

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.* 463 U.S. 29, 43 (1983)....................... 11

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003).......................................... 41

*Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006)........................... 43, 45

*NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1320 (Fed. Cir. 2009) ........................ 43, 46

*NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1206 (Fed. Cir. 1995)................................ 33

*QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) ...................................... 32

*Saha Thai Steel Pipe (Public) Co. v. United States*, 635 F.3d 1335, 1341 (Fed. Cir. 2011) ........ 33

*Sahaviriya Steel Indus. Public Co. v. United States*, 649 F.3d 1371, 1375 (Fed. Cir. 2011) ....... 44

*Sahaviriya Steel Industries Public Co. Ltd. v. United States*, 714 F.Supp.2d 1263, 1280 ........... 45

SEC v. Chenery Corp., 332 U.S. 194, 196 (1947).......................................................... 11

*Serampore Indus. v. United States*, 675 F. Supp. 1354 (Ct. Int'l Trade 1987)............................ 12

*Thai Pineapple Public Co. v. United States*, 187 F.3d 1362, 1367 (Fed. Cir. 1999)................... 33

*Thai Plastic Bags Industries Co. v. United States*, 746 F.3d 1359, 1366 (Fed. Cir. 2014) .... 29, 40

*Tianjin Mach. Imp. & Exp. Corp. v. United States*, 28 CIT 1635, 1642 (2004)......................... 43

*Timken Co. v. United States*, 354 F.3d 1334 (Fed. Cir. 2004)......................................... 13, 17, 23

*Timken Co. v. United States*, No. 03-1098, 2003 WL 24305310,

    at *18 (Fed. Cir. filed May 19, 2003) .................................................................. 13

*Tung Fong Indus. Co. v. United States*, Slip Op. 04-32 (Ct. Int'l Trade 2004)........................... 41

*U.S. Steel Corp. v. United States*, 621 F.3d 1351 (Fed. Cir. 2010) ............................................ 14

*Unicatch Industrial Co., Ltd. v. United States*,

    539 F.Supp.3d 1229, 1246 (Ct. Int'l Trade 2021) .................................................... 32

*Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369–70 (Fed. Cir. 1998) ...................... 11

*Williams v. Taylor*, 529 U.S. 362, 404 (2000) ........................................................................... 20

**Statutes**

19 U.S.C. § 1677e(a)(1).............................................................................................. 41

19 U.S.C. § 1516a(b)(1)(B)(i)..................................................................................... 10

19 U.S.C. § 1677b(f)(1)(A)................................................................................... 29, 33, 39

19 U.S.C. § 1677e(a)................................................................................................... 41

19 U.S.C. § 1677f-1(d)(1)............................................................................................. 7

19 U.S.C. § 3512(a) ................................................................................................ 14

19 U.S.C. § 3533 and § 3538 ................................................................................. 14

19 U.S.C. §§ 1677e(a) and (b) ............................................................................... 29

19 U.S.C. § 1677(35)(A) ....................................................................... 2,13, 16, 17, 20

19 U.S.C. § 1677(35)(B) ......................................................................................... 16

19 U.S.C. § 1677e(a) .............................................................................................. 22

19 U.S.C. § 1677e(a)(1) ......................................................................................... 22

19 U.S.C. § 1677e(2) .............................................................................................. 42

19 U.S.C. § 1677e(b) ......................................................................................... 22, 42

19 U.S.C. § 1677e(b)(2) ......................................................................................... 24

19 U.S.C. § 1677f-1(d) ..................................................................... 2, 14, 18, 20, 21

19 U.S.C. § 1677f-1(d)(1)(A)(i) ............................................................................ 18

19 U.S.C. § 1677f-1(d)(1)(A)(ii) ........................................................................... 18

19 U.S.C. § 1677f-1(d)(1)(B) .................................................................................. 7

## Regulations

19 C.F.R. § 351.401(i) ............................................................................................ 43

19 C.F.R. § 351.414(c)(2) ....................................................................................... 18

## Administrative Determinations

*Certain Corrosion-Resistant Steel Products From Australia, Brazil, Canada, Mexico, the*
*Netherlands, South Africa, Taiwan, the Republic of Türkiye, the United Arab Emirates, and*
*the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigation*,
89 Fed. Reg. 80,196 (Dep't Commerce Oct. 2, 2024) ............................................. 5

*Certain Corrosion-Resistant Steel Products From Mexico: Final Affirmative Determination of*
*Sales at Less Than Fair Value*; 90 Fed. Reg. 42,187 (Aug. 29, 2025) ..................... 8

*Certain Corrosion-Resistant Steel Products From the Republic of Turkiye: Preliminary*
*Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final*
*Determination, and Extension of Provisional Measures*, 90 Fed. Reg. 15,340 (Dep't
Commerce Apr. 10, 2025) ("Preliminary Determination") and accompanying Decision
Memorandum ........................................................................................................... 6

*Corrosion-Resistant Steel Products From Brazil and Mexico: Amended Final Antidumping Duty*
*Determination; Corrosion-Resistant Steel Products From Australia, Brazil, Canada, Mexico,*

*the Netherlands, South Africa, Taiwan, the Republic of Türkiye, the United Arab Emirates, and the Socialist Republic of Vietnam: Antidumping Duty Orders*, 90 Fed. Reg. 59,494 (Dep't Commerce Dec. 19, 2025).......................................................................................... 10

*Corrosion-Resistant Steel Products From the Republic of Türkiye: Amended Preliminary Determination of Sales at Less Than Fair Value*, 90 Fed. Reg. 19,677 (Dep't Commerce May 9, 2025)...................................................................................................... 6

*Corrosion-Resistant Steel Products From the Republic of Türkiye: Final Affirmative Determination of Sales at Less Than Fair Value,* 90 Fed. Reg. 42,216 (Dep't Commerce Aug. 29, 2025) ("Final Determination") and accompanying Issues and Decision Memorandum ..................................................................................................................................... passim

## Other Authorities

*Report of the WTO Panel, United States – Final Antidumping Measures on Stainless Steel from Mexico*, WT/DS344 (Dec. 20, 2007) at para. 7.136............................................................ 19

*Report of the WTO Panel, United States – Final Dumping Determination on Softwood Lumber from Canada – Recourse to Article 21.5 of the DSU by Canada*, WT/DS264/RW (Apr. 3, 2006) at para. 5.33 ................................................................................................. 19

*Report of the WTO Panel, United States – Measures Relating to Zeroing and Sunset Reviews*, WT/DS322/R (Sept. 20, 2006) at paras. 7.127, 7.138-7.140...................................................... 19

*Report of the WTO Panel, US-Zeroing (EC)*, WT/DS294/R (Oct. 31, 2005) at para 7.266......... 19

*Statement of Administrative Action Accompanying the URAA,* H.R. Rep. No. 103-316 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4178 ("SAA")..................................... 18, 25, 29, 39, 40

*The American Heritage College Dictionary* at 477 (3d. ed. 1993)............................................... 17

*United States – Laws, Regulations and Methodology for Calculating Dumping Margins ("Zeroing")*, WT/DS294/R (May 15, 2006).......................................................................... 14

*Wesbster's New Twentieth Century Dictionary of the English Language Unabridged* at 636 (2d. ed. 1980) ...................................................................................................... 17

On behalf of Steel Dynamics, Nucor Corporation, United States Steel Corporation, and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC (collectively, "Plaintiffs"), we submit this motion for judgment on the agency record and accompanying brief in the above-captioned action. Plaintiffs respectfully request that this Court remand the final determination of the U.S. Department of Commerce ("Commerce") in *Certain Corrosion-Resistant Steel Products From the Republic of Türkiye: Final Affirmative Determination of Sales at Less Than Fair Value*, 90 Fed. Reg. 42,216 (Aug. 29, 2025) ("Final Determination") (Public Record ("P.R.") 364) to address the aspects of the Final Determination challenged herein.[1] The findings and conclusions relating to the contested aspects of the Final Determination are set forth in the accompanying *Issues and Decision Memorandum for the Final Affirmative Determination of Sales at Less Than Fair Value in the Investigation of Certain Corrosion-Resistant Steel Products from the Republic of Türkiye,* Inv. No. A-489-855 (Aug. 25, 2025) ("IDM") (P.R. 354).

## I.    RULE 56.2 STATEMENT AND SUMMARY OF ARGUMENT

### A.  Administrative Determination For Which Review Is Sought

Plaintiffs' appeal arises from the Final Determination, which was published in the Federal Register on August 29, 2025, and the accompanying IDM.

### B.  Issues Presented and Summary of Arguments

**1.  Whether Commerce's failure to "zero" Borcelik's U.S. sales made above normal value was contrary to law**

When Commerce calculated the dumping margin for Borcelik Celik Sanayii Ticaret A.S. ("Borcelik"), it allowed non-dumped sales made above normal value to offset dumped sales

---

[1] Citations to documents on the confidential administrative record are denoted as "C.R." and citations to the public administrative record are denoted as "P.R." in this brief.

PUBLIC VERSION

made below normal value, reducing Borcelik's dumping margin. This was contrary to law because the antidumping statute is best read to require Commerce to treat non-dumped sales as having no or zero dumping margins ("zeroing"). Prior decisions of the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") made under a *Chevron* framework have found that the statute may be reasonably interpreted to either require or not require zeroing. However, no court has ruled on which interpretation constitutes the best reading of the statute. The U.S. Supreme Court's decision in *Loper Bright*, which overruled *Chevron*, now requires this Court to determine the best reading of the statute rather than defer to Commerce's interpretation. Under that standard, the best reading is that Commerce is required to treat non-dumped sales as having zero dumping margins. Indeed, 19 U.S.C. §1677(35)(A) defines a dumping margin as the amount by which normal value "exceeds" U.S. price, meaning that Commerce may not calculate dumping margins for sales where normal value is less than U.S. price. Further, 19 U.S.C. §1677f-1(d)'s distinction between average-to-average and average-to-transaction comparison methods has practical effect only if Commerce zeroes non-dumped sales.

**2. Whether Commerce's decision to apply an AFA adjustment to Borcelik's home market freight expenses that rewarded Borcelik's non-cooperation was unsupported by substantial evidence and not in accordance with law**

Commerce determined that Borcelik reported inaccurate freight expenses that were unable to be verified and that Borcelik failed to cooperate to the best of its ability, meriting the application of facts otherwise available with an adverse inference ("AFA"). However, Commerce's AFA adjustment decreased, rather than increased, Borcelik's dumping margin, effectively rewarding its non-cooperation. This was not in accordance with law because the purpose of the AFA statute is to ensure that respondents have an incentive to cooperate with Commerce's investigation. Although Commerce has discretion over choosing an AFA

2

PUBLIC VERSION

adjustment, that discretion is bounded by the statutory requirement that an adverse inference actually be adverse. Because Commerce's chosen adjustment rewarded Borcelik's non-cooperation, it contravened the statute.

### 3.  Whether Commerce's deduction of internal stock transfers from Borcelik's finished goods inventory balance was unsupported by substantial evidence and not in accordance with law

When Borcelik performed its cost reconciliation between its cost of goods sold and its cost of manufacture, it deducted an item for "internal stock transfers" from its finished goods inventory balance. This was improper because the net value of internal stock transfers reflects actual finished goods that should not have been removed from Borcelik's finished goods inventory and indeed was included in Borcelik's monthly calculations of finished goods inventory. Internal stock transfers are transfers of finished goods within divisions and warehouses belonging to Borcelik and reflect finished goods that are temporarily transferred out of inventory for various reasons, such as to undergo additional processing, and then transferred back into finished goods inventory. The exhibits Borcelik submitted during Commerce's verification of its costs confirm that its monthly ending finished good inventory balances were calculated net of internal stock transfers. By deducting the total net internal stock transfer value, Borcelik undid the effect of that calculation, which reduced its costs and lowered its dumping margin. Commerce's acceptance of this improper deduction was not supported by substantial evidence and was otherwise not in accordance with law.

### 4.  Whether Commerce erred in accepting YDC's unverifiable depreciation methodology and distorted gross-production cost database

Commerce made two related and reversible errors in calculating the costs of production of Yildiz Demir Celik Sanayi A.S. ("YDC"). First, Commerce accepted YDC's depreciation expense based on claimed inflation-related asset revaluations that neither Commerce nor

3

PUBLIC VERSION

Plaintiffs could verify. Indeed, YDC acknowledged that it did not maintain – and could not reconstruct – the revaluation schedules that would have substantiated the claimed inflation-related asset revaluations. Second, Commerce accepted YDC's gross production cost methodology despite record evidence demonstrating that approximately [    ] percent of YDC's costs consisted of intermediate stage merchandise subsequently consumed in further manufacturing, not the merchandise ultimately sold. Verification established that YDC's accounting system separately tracked net cost of manufacturing ("COM") and costs associated with consumed semi-finished goods ("SFG") as distinct line items. Commerce's finding that no distortion existed, and its finding that YDC lacked the capability to isolate net production, are irreconcilable with the verified record. Each error independently suppresses the dumping margin, and together they compound the distortion. Commerce's failure to address either distortion, or to apply AFA in response to YDC's deficient reporting, rendered its determination unsupported by substantial evidence and contrary to law.

**5. Whether Commerce's reversal of its preliminary date of sale determination was unsupported by substantial evidence and not in accordance with law**

In the preliminary determination, Commerce correctly relied on the pro-forma invoice date as the date of sale, consistent with YDC's own repeated, certified admissions that its pro-forma invoice is issued only after all material terms are finalized and that no revisions are accepted thereafter. In the Final Determination, Commerce abandoned that well-supported methodology based on at most a single verified instance of a post-pro-forma invoice change that Commerce itself characterized as a tolerance-level adjustment – while simultaneously finding that all other alleged post-pro-forma invoice changes identified in the record were not material. Its decision lacked support in the facts and the law.

4

## II.    STATEMENT OF FACTS

On September 5, 2024, Plaintiffs filed an antidumping petition concerning unfairly traded imports of corrosion-resistant steel ("CORE") from Türkiye. Plaintiffs alleged that CORE imported from Türkiye was being or was likely to be sold at less than fair value within the meaning Section 731 of the Tariff Act of 1930, as amended (the "Act"). Plaintiffs requested that Commerce initiate an antidumping investigation of CORE from Türkiye and ultimately calculate a dumping margin and assign duties to remedy the dumping.

On September 25, 2024, Commerce initiated an antidumping investigation of imports of CORE from Türkiye. *Certain Corrosion-Resistant Steel Products From Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, the Republic of Türkiye, the United Arab Emirates, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigation*, 89 Fed. Reg. 80,196 (Dep't Commerce Oct. 2, 2024) (P.R. 53). On October 23, 2024, Commerce selected Borcelik and YDC as the mandatory respondents and issued antidumping questionnaires to these entities.

On April 10, 2025, Commerce preliminarily determined that CORE from Türkiye was sold in the United States at less than fair value. *Certain Corrosion-Resistant Steel Products From the Republic of Turkiye: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 90 Fed. Reg. 15,340 (Dep't Commerce Apr. 10, 2025) ("Preliminary Determination") (P.R. 243). Commerce set forth its preliminary findings and conclusions in the accompanying *Decision Memorandum for the Preliminary Affirmative Determination of Sales at Less Than Fair Value in the Investigation of Certain Corrosion-Resistant Steel Products from the Republic of Türkiye* (Apr. 3, 2025) ("Preliminary Decision Memorandum") (P.R. 228). After adjusting for certain

5

ministerial errors in the Preliminary Determination, Commerce calculated dumping margins of

2.04 percent for Borcelik, 15.18 percent for YDC, and 8.61 percent for all other Turkish

producers or exporters. *Corrosion-Resistant Steel Products From the Republic of Türkiye:*

*Amended Preliminary Determination of Sales at Less Than Fair Value*, 90 Fed. Reg. 19,677

(Dep't Commerce May 9, 2025) (P.R. 292).

Commerce verified the sales and cost information reported in the questionnaire responses

submitted by YDC and Borcelik. It subsequently issued its sales and cost verification reports for

both companies. YDC Sales Verification Report (May 27, 2025) (C.R. 500, P.R. 308); Borcelik

Sales Verification Report (July 8, 2025) (C.R. 543, P.R. 316); Borcelik Cost Verification Report

(July 7, 2025) (C.R. 539, P.R. 310); YDC Cost Verification Report (July 9, 2025) (C.R. 540,

P.R. 313).

On July 16, 2025, Commerce issued a post-preliminary determination implementing

changes to its differential pricing analysis. *Decision Memorandum for the Post Preliminary*

*Affirmative Determination in the Less-Than-Fair-Value Investigation of Certain Corrosion-*

*Resistant Steel Products from the Republic of Türkiye* (July 16, 2025) ("Post-Preliminary

Memorandum") (C.R. 573, P.R. 321). Commerce explained that it was modifying its differential

pricing analysis in light of recent decisions issued by the Federal Circuit. *Id.* at 1-2. Commerce

applies its differential pricing analysis to determine whether targeted dumping exists. Under the

statute, Commerce may calculate dumping margins using one of two methods depending on the

existence of targeted dumping. 19 U.S.C. §1677f-1(d)(1). Under the first method, which

Commerce uses if targeted dumping is not present, Commerce calculates a dumping margin by

6

comparing weighted-average normal values[2] to weighted-average U.S. prices (the "average-to-average" method). However, if targeted dumping is present, Commerce may calculate a dumping margin by comparing weighted-average normal values to individual U.S. transaction prices (the "average-to-transaction" method). Targeted dumping exists when (i) "there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time" and (ii) Commerce explains why such differences cannot be taken into account using the average-to-average method. *Id.* §1677f-1(d)(1)(B). Commerce's differential pricing analysis is the test it uses to determine whether there is a "pattern" of export prices that "differ significantly among purchasers, regions, or periods of time."

In response, Plaintiffs submitted comments to Commerce stating that, regardless of how Commerce modified its differential pricing analysis, Commerce should apply its "zeroing" methodology to all sales comparisons such that Commerce would treat all non-dumped U.S. sales as having zero dumping margins for purposes of calculating the mandatory respondents' weighted-average dumping margins. Petitioners' Letter in Lieu of Post-Preliminary Determination Case Brief (July 24, 2025) at 2 (P.R. 340). When Commerce does not zero non-dumped U.S. sales, it allows U.S. sales made at prices above normal value to "offset" dumped U.S. sales made at prices below normal value, partially cancelling out the positive dumping margin created by dumped sales.

Plaintiffs submitted case and rebuttal briefs regarding certain aspects of Commerce's Preliminary Determination. In the sales case and rebuttal briefs, Plaintiffs addressed three issues relevant to this appeal. First, Plaintiffs demonstrated that the best reading of the statute was that

---

[2] "Normal values" refer to sales prices of the foreign like product in the respondent's home market.

it required Commerce to employ zeroing for all sales comparisons in calculating dumping margins for the final determination. Petitioners' Sales Case Brief at 4 (C.R. 581, P.R. 339). Second, Plaintiffs demonstrated that Borcelik failed to cooperate to the best of its ability to report its home market inland freight expenses and that Commerce must use AFA to fill the gap in the record created by Borcelik's failure. *Id.* at 18. Third, Plaintiffs argued that Commerce correctly relied on the pro-forma invoice date as the date of sale for YDC's U.S. sales because the record shows that the material terms of sale were fixed at that time. Petitioners' Sales Rebuttal Brief at 22-27 (C.R. 587, P.R. 349).

In the cost case brief, Plaintiffs identified two additional issues. First, Plaintiffs argued that Borcelik improperly deducted an item for "net internal stock transfers" from its finished goods inventory balance. Petitioners' Cost Case Brief at 21 (C.R. 576, P.R. 332). Second, Plaintiffs argued that Commerce should assign YDC a rate based on total AFA due to YDC's failure to substantiate its reported depreciation expense and its improper inclusion of SFG in its cost database. *Id.* at 23-39.

On August 29, 2025, Commerce published its final affirmative determination. Final Determination, 90 Fed. Reg. at 42,216 (P.R. 364). Commerce calculated final dumping margins of 6.48 percent for Borcelik, 10.49 percent for YDC, and 8.06 percent for all other Turkish producers or exporters. *Id.*

Commerce erred in certain respects in its Final Determination. First, Commerce improperly failed to zero Borcelik's non-dumped sales when it calculated Borcelik's dumping margin. IDM at 46 (P.R. 354); *see also* Borcelik Final Analysis Memorandum (Aug. 25, 2025) at 3 (C.R. 609, P.R. 362). In offsetting dumped sales with non-dumped sales, Commerce relied on prior Federal Circuit decisions deferring to its discretion to use offsetting rather than following

8

the best reading of the statute requiring the use of zeroing. IDM at 49 (P.R. 354). Second, although Commerce agreed with Plaintiffs that Borcelik failed to accurately report its home market freight expenses and that Borcelik did not cooperate to the best of its ability, justifying the application of AFA, Commerce did not actually make an adjustment that was adverse to Borcelik. *Id.* at 9-10. Instead, the remedy that it applied had the effect of decreasing, rather than increasing, Borcelik's dumping margin. *Id.* at 10; *see also* Borcelik Final Analysis Memorandum at 3 (C.R. 609, P.R. 362) (adjusting Borcelik's reported inland freight expense by "applying the lowest reported inland freight cost applicable to the relevant destination"). Third, Commerce wrongly reversed its preliminary finding regarding the date of sale for YDC's U.S. sales. Commerce adopted the earlier of commercial invoice date or shipment date as the date of sale instead of the pro-forma invoice date purely based on a single instance of a change to a sales term after issuance of the pro-forma invoice. IDM at 32-34 (P.R. 354).

Regarding cost issues, Commerce permitted Borcelik to deduct net internal stock transfers from its finished goods inventory balance. *Id.* at 23. Commerce incorrectly allowed the deduction even though internal stock transfers represented goods on hand and had been included in Borcelik's monthly calculations of finished goods inventory. *Id.* This had the effect of artificially reducing Borcelik's reported costs and reducing Borcelik's dumping margin. Additionally, Commerce improperly accepted YDC's reported depreciation expense based on YDC's unverifiable assertions that inflation had already been reflected in the reported depreciation expense. *Id.* at 31-32. Commerce also continued to allow the inclusion of SFG in YDC's reported costs pursuant to YDC's gross production methodology despite record evidence demonstrating that this methodology distorted YDC's costs. *Id.* at 29-31.

On December 19, 2025, Commerce published the antidumping duty order on CORE from Türkiye. *Corrosion-Resistant Steel Products From Brazil and Mexico: Amended Final Antidumping Duty Determination; Corrosion-Resistant Steel Products From Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, the Republic of Türkiye, the United Arab Emirates, and the Socialist Republic of Vietnam: Antidumping Duty Orders*, 90 Fed. Reg. 59,494 (Dep't Commerce Dec. 19, 2025) (P.R. 375). This action followed.

## III.    STANDARD OF REVIEW

The standard of review requires that the Court remand any determination, finding, or conclusion by Commerce if it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. §1516a(b)(1)(B)(i). The substantial evidence standard requires "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence is "more than a mere scintilla," but "less than the weight of the evidence." *Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004). In reviewing Commerce's determinations, the court "may not supply a reasoned basis for the agency's action that the agency itself has not given," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.* 463 U.S. 29, 43 (1983) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)), but may uphold an agency's action "where the agency's decisional path is reasonably discernable." *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369–70 (Fed. Cir. 1998) (citing *Ceramica Regiomontana, S.A. v. United States*, 810 F.2d 1137, 1139 (Fed. Cir. 1987)).

When determining whether Commerce's interpretation and application of a statute is in accordance with law, the Court is guided by the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) ("*Loper Bright*"). In *Loper Bright*, the Supreme

Court established a new standard by which courts resolve questions of statutory interpretation when reviewing challenges to agency action. *Loper Bright* held that courts "may not defer to an agency interpretation of the law simply because a statute is ambiguous," *id.* at 413, and rejected the "presum{ption} that statutory ambiguities are implicit delegations to agencies." *Id.* at 399. In so holding, the Supreme Court overruled the framework adopted by *Chevron, U.S.A. Inc. v. Natural Res. Def. Council Inc.*, 467 U.S. 837, 104 S. Ct. 2778 (1984) ("*Chevron*"), which had held that courts must defer to an agency's reasonable interpretation of a statute if the court finds that the statute is ambiguous. *Id.* at 412 ("*Chevron* is overruled."). Instead of deferring to the agency's preferred interpretation of a statute, courts must "use every tool at their disposal to determine the best reading of the statute and resolve the ambiguity." *Id.* at 403. Although the agency's interpretation of the statute may be accorded "due respect," *id.* at 394-95, ultimately courts must "exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Id.* at 412. The "best reading of the statute" is "the reading the court would have reached if no agency were involved." *Id.* at 400 (internal quotations omitted).

## IV.    ARGUMENT

### A. Commerce's Failure to Treat Borcelik's Non-Dumped Sales as Having No or Zero Dumping Margins Is Contrary to Law

To calculate a dumping margin, Commerce compares prices for subject merchandise the respondent sold in the U.S. market ("export prices" or "U.S. prices") to prices for equivalent merchandise sold by the respondent in its home market ("normal values"). Dumping occurs when the respondent sells subject merchandise in the United States at prices below normal value. In the Final Determination, Commerce calculated Borcelik's dumping margin using a methodology that "offset" Borcelik's non-dumped sales against Borcelik's dumped sales. This means that when Borcelik made sales in the United States at prices *above* normal value,

11

Commerce's approach allowed these sales to partially cancel out Borcelik's sales made below normal value. Effectively, Commerce treated Borcelik's sales above normal value as having a "negative" dumping margin. This was contrary to law. Under the statute, there are no "negative" dumping margins. There are only dumped sales, which create a positive dumping margin, and non-dumped sales, which do not. The best reading of the statute is that Commerce must treat non-dumped sales as having no or zero dumping margins ("zeroing").

### 1. Legal Background

For decades, Commerce's standard practice was to zero U.S. sales of subject merchandise made at prices above normal value – *i.e.*, to apply zeroing to all sales comparisons in calculating weighted-average dumping margins. This Court repeatedly upheld this practice. *See, e.g.*, *Serampore Indus. v. United States*, 675 F. Supp. 1354 (Ct. Int'l Trade 1987); *Bowe Passat Reingungs-Und Waschere-itechnik GmbH v. United States*, 926 F. Sup. 1138 (Ct. Int'l Trade 1996).

The Federal Circuit first upheld Commerce's zeroing practice in *Timken Co. v. United States*, 354 F.3d 1334 (Fed. Cir. 2004) ("*Timken*"). In *Timken*, Commerce defended its zeroing practice and took the position that the plain meaning of the statute required the agency to zero. *Timken*, 354 F.3d at 1340-41. Specifically, Commerce pointed to 19 U.S.C. §1677(35)(A), which defines "dumping margin" as "the amount by which the normal value *exceeds* the export price…of the subject merchandise." (emphasis added). Commerce explained that under this provision, "{t}he antidumping statute unambiguously requires Commerce to consider only transactions where the price falls below {normal value} in calculating dumping margins." Brief of Defendant-Appellee United States, *Timken Co. v. United States*, No. 03-1098, 2003 WL 24305310, at *18 (Fed. Cir. filed May 19, 2003) (quoted in Petitioners' Sales Case Brief at 5

(C.R. 581, P.R. 339)). The statute contemplates that a dumping margin be calculated where normal value is greater than the U.S. price, but *not* where normal value is less than U.S. price.

At the time *Timken* was argued, *Chevron* was good law. The court therefore applied *Chevron* to "determine whether the statute *unambiguously* requires providing for zeroing negative margin transactions and, if not, whether Commerce reasonably interpreted the statute to so require." *Timken*, 354 F.3d at 1341 (emphasis added). The Federal Circuit found that it was a "close question" as to whether the antidumping statute unambiguously required zeroing on the basis articulated by Commerce but ultimately decided under the *Chevron* standard that Congress had not spoken plainly enough to be unambiguous. *Id.* at 1341-42. Instead, the Federal Circuit upheld Commerce's interpretation that zeroing was required as a "reasonable interpretation of the statute." *Id.* at 1342.

Following the decision in *Timken*, the European Communities successfully challenged Commerce's zeroing practice at the World Trade Organization. *United States – Laws, Regulations and Methodology for Calculating Dumping Margins ("Zeroing")*, WT/DS294/R (May 15, 2006). In response, Commerce abandoned its zeroing practice and recalculated weighted-average dumping margins in certain pending investigations using an "offsetting" methodology, whereby U.S. sales made at prices above normal value could create a "negative" dumping margin and offset the positive dumping margin created by U.S. sales made below normal value.[3]

---

[3] Commerce changed its practice by initiating proceedings under 19 U.S.C. § 3533 and § 3538. These provisions describe procedures by which Commerce may consult with Congress and the U.S. Trade Representative to determine whether and how to change agency practice in light of an adverse WTO ruling. However, where Commerce undertakes these procedures to implement an adverse WTO ruling, the implementation of that ruling must be consistent with U.S. law. Otherwise, the WTO ruling may not be given any effect. 19 U.S.C. § 3512(a) (providing that "no provision of any of the Uruguay Round Agreements, nor the application of any such provision to

PUBLIC VERSION

Commerce's use of "offsetting" was challenged in *U.S. Steel Corp. v. United States*, 621 F.3d 1351 (Fed. Cir. 2010) ("*U.S. Steel*"). There, appellants argued that Congress's clear intent for Commerce to zero was reflected in 19 U.S.C. §1677f-1(d), which directs Commerce to use an average-to-average comparison method in normal investigations and an average-to-transaction comparison method in investigations where targeted dumping is present. Plaintiffs mathematically demonstrated that if zeroing is not used, the same weighted-average dumping margin would be calculated under both comparison methods, nullifying Congress's clear intent that the different methods produce different results. The Federal Circuit, again applying *Chevron*, found that although "Congress may have assumed that Commerce would continue its zeroing methodology, and its assumption may underlie the enumeration of different calculation methodologies in §1677f-1(d)," Congress had not provided a "clear Congressional instruction that Commerce must continue to {zero}." *U.S. Steel*, 621 F.3d at 1362-63. Because this meant that the statute was ambiguous, the court moved to the second step of the *Chevron* framework and deferred to Commerce's new interpretation of the antidumping statute as reasonable.

The Supreme Court's decision in *Loper Bright* overruled *Chevron. Loper Bright* held that courts "may not defer to an agency interpretation of the law simply because a statute is ambiguous" and rejected *Chevron*'s "presum{ption} that statutory ambiguities are implicit delegations to agencies." *Loper Bright*, 603 U.S. at 399, 413. Instead of deferring to the agency's preferred interpretation of a statute, courts must "use every tool at their disposal to determine the best reading of the statute and resolve the ambiguity." *Id.* at 403. Although agency interpretations may be accorded "due respect," especially "interpretations issued

---

any person or circumstance, that is inconsistent with any law of the United States shall have effect").

PUBLIC VERSION

contemporaneously with the statute at issue, and which have remained consistent over time," ultimately courts must exercise their independent judgment in deciding which statutory interpretation is "best." *Id.* at 394-95. Following *Loper Bright*, an agency action taken on the basis of a statutory interpretation that is not the "best" is unlawful.

### 2.   The Antidumping Statute Is Best Read to Require Zeroing

When Plaintiffs argued that Commerce was required to zero during the investigation here, Commerce responded that *Loper Bright* had not overruled cases that relied on *Chevro*n and that the Federal Circuit's precedent holding that zeroing was not unambiguously required remained in operation. IDM at 49 (P.R. 354). Commerce misunderstood the state of the law. *No court has yet ruled on which interpretation constitutes the "best" reading of the antidumping statute. In *Timken*, the Federal Circuit found that the statute was ambiguous but that Commerce's interpretation that zeroing was required was reasonable. In *U.S. Steel*, the Federal Circuit also found that the statute was ambiguous and that Commerce's revised interpretation that zeroing was not required was also reasonable. Following the decision in *Loper Bright*, the courts must "use every tool at their disposal to determine the best reading of the statute and resolve the ambiguity." *Loper Bright*, 603 U.S. at 403. The Federal Circuit identified an ambiguity but did not resolve it and instead deferred to agency interpretations. That option is no longer available to this Court. For the following reasons, the Court should resolve the ambiguity by finding that the statute is best read to require zeroing.

### a)   19 U.S.C. §1677(35)(A)-(B) Require Zeroing

19 U.S.C. §1677(35)(A) defines "dumping margin" as "the amount by which the normal value *exceeds* the export price or constructed export price of the subject merchandise" (emphasis added). In turn, §1677(35)(B) defines "weighted average dumping margin" as "the percentage

PUBLIC VERSION

determined by dividing the aggregate dumping margins determined for a specific exporter or producer by the aggregate export prices and constructed export prices of such exporter or producer." These statutory provisions are best read to require that a "dumping margin" be calculated where normal value is greater than – that is, "exceeds" – U.S. price, and *not* where normal value is less than U.S. price. The statute does not use a value-neutral term such as the "difference between" normal value and U.S. price, which could permit normal value to be either greater than or less than U.S. price and the calculation of both positive and negative dumping margins. Instead, Commerce may only calculate a dumping margin where normal value is higher than U.S. price. That limits dumping margins to positive margins. There is no such thing as a negative dumping margin, because a "dumping margin" may not be calculated when normal value is *less than* U.S. price. It must "exceed" U.S. price. Thus, so-called negative margins where normal value does not exceed U.S. price must be disregarded, or zeroed, in the numerator of the weighted average dumping margin calculation described in §1677(35)(B).

This reading flows from the ordinary meaning of the term "exceeds." Dictionary definitions from the period in which the Uruguay Round Agreements Act ("URAA") was adopted define "exceed" as "to be or go beyond (the given or supposed limit, measure, or quantity)," or "1. To be greater than; surpass. 2. To go beyond the limits of." *Wesbster's New Twentieth Century Dictionary of the English Language Unabridged* at 636 (2d. ed. 1980); *The American Heritage College Dictionary* at 477 (3d. ed. 1993); *see also* Petitioners' Sales Case Brief at 9 (C.R. 581, P.R. 339). Likewise, a more current dictionary edition defines "exceed" as "to be greater than or superior to."[4] It is impossible and defies basic mathematical logic for a smaller number to "be greater than" or "go beyond" a larger number. Such a reading would be

---

[4] www.merriam-webster.com/dictionary/exceed (last accessed May 29, 2026).

wholly unnatural, and statutes must be interpreted to "give words their 'ordinary or natural' meaning." *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004).

*Timken* supports Plaintiffs' position that §1677(35)(A)'s definition of "dumping margin" as "the amount by which the normal value exceeds the {U.S. price} of the subject merchandise" is best read to limit dumping margins to positive numbers, and to therefore require zeroing. Applying *Chevron*, the Federal Circuit found that it was a "close question" whether the statute *unambiguously* required zeroing on this basis. *Timken*, 354 F.3d at 1341. However, the court ultimately was "reluctant to find these dictionary definitions so clear as to compel a finding that Congress expressly intended to require zeroing," explaining that the statute "*could arguably* allow for negative dumping margins" because a possible way of mathematically expressing "x exceeds y" is "x-y", an equation that could have a negative result. *Id.* at 1341-42 (emphasis added). However, under *Loper Bright*, if the choice is between a statutory interpretation that "could arguably" be allowed and an interpretation that is "close" to clear, the latter must always be the "best reading." Indeed, in *Timken*, Commerce took the position that §1677(35)(A) clearly required zeroing by limiting dumping margins to positive numbers. *Id.* at 1341.

### b) 19 U.S.C. §1677f-1(d) Requires Zeroing

19 U.S.C. §1677f-1(d) directs Commerce to compare normal values to U.S. prices using two different methodologies in two different scenarios:

(i)   In normal investigations (*i.e.*, those without targeted dumping), Commerce is to use the "average-to-average" comparison method and compare weighted average normal values to weighted average U.S. prices;[5] and

---

[5] 19 U.S.C. §1677f-1(d)(1)(A)(i). The statute also authorizes Commerce to compare individual home market transaction prices to individual U.S. transaction prices in normal investigations. 19 U.S.C. §1677f-1(d)(1)(A)(ii). This "transaction-to-transaction" methodology is used infrequently and is intended for cases where "there are very few sales and the merchandise sold in each market is identical, or very similar or is custom made." Statement of Administrative Action Accompanying the URAA, H.R. Rep. No. 103-316 (1994), at 842, *reprinted in* 1994

(ii)     In investigations with targeted dumping, Commerce is to use the "average-to-transaction" comparison method and compare weighted average normal values to individual U.S. transaction prices.

This provision instructs Commerce on which comparison method it is to use (and not use) in each scenario. It is clear from the language and structure of the statute that Congress intended for the different methodologies to produce different margin outcomes. Otherwise, the requirement to use a given methodology in a given scenario would be meaningless.

Without zeroing, that is precisely the result. As a mathematical matter, unless "negative" margins are zeroed, the margin outcome will always be the same no matter which comparison method is used in a given scenario. This nullifies Congress's directive that Commerce produce different margin outcomes by using different comparison methodologies depending on the scenario. Further, this mathematical principle is not subject to dispute. The U.S. Government has explicitly relied on this principle in legal proceedings before the WTO, and the principle has been recognized by four separate WTO dispute settlement panels.[6] Plaintiffs placed mathematical proofs illustrating this principle on the administrative record. Petitioners' Sales Case Brief at Exhibits 1 and 2 (C.R. 581, P.R. 339).

It is perfectly natural for the statute to operate this way, because Congress adopted these provisions while Commerce was still zeroing and had no expectation that this practice would

---

U.S.C.C.A.N. 4040, 4178 ("SAA") (recognizing that this methodology would be used "far less frequently" than the average-to-average method); *see also* 19 C.F.R.§351.414(c)(2).

[6] *Report of the WTO Panel, United States – Final Antidumping Measures on Stainless Steel from Mexico*, WT/DS344 (Dec. 20, 2007) at para. 7.136; *Report of the WTO Panel, US-Zeroing (EC)*, WT/DS294/R (Oct. 31, 2005) at para 7.266; *Report of the WTO Panel, United States – Final Dumping Determination on Softwood Lumber from Canada – Recourse to Article 21.5 of the DSU by Canada*, WT/DS264/RW (Apr. 3, 2006) at para. 5.33; *Report of the WTO Panel, United States – Measures Relating to Zeroing and Sunset Reviews*, WT/DS322/R (Sept. 20, 2006) at paras. 7.127, 7.138-7.140.

18

PUBLIC VERSION

cease. Without zeroing, Congress might just as well have decreed that in normal investigations, Commerce may use either of the two comparison methods because, unless zeroing is employed, the exact same dumping margin would be calculated no matter which comparison method is used. Indeed, it would have been absurd for Congress to direct that Commerce use the average-to-average comparison method in normal investigations when the very same margin would be calculated if individual U.S. transaction prices were used instead.

In its IDM, Commerce accepted that without zeroing, a dumping margin calculated using the average-to-average method would be "mathematically equivalent" to a dumping margin calculated using the average-to-transaction method. IDM at 50 (P.R. 354). However, Commerce argued that its practice of zeroing in targeted dumping investigations (but not in normal investigations) preserved the distinction between the two comparison methods. *Id.*

Commerce's argument is meritless. Putting aside what Commerce does in targeted dumping investigations, Commerce's failure to use zeroing in normal investigations renders Congress's choice to require the average-to-average comparison method in normal investigations – and to thereby prohibit the use of the average-to-transaction method in normal investigations – meaningless because it results in the same dumping margin. Without a requirement to zero, the comparison method chosen by Congress for use in normal investigations would itself have no independent impact on the margin outcome, in violation of Congress's clear intent that the comparison method, by itself, would change the margin and in violation of the principle that statutes must be interpreted to give effect to every clause and word of the statute. *See Williams v. Taylor*, 529 U.S. 362, 404 (2000) (it is a "cardinal principle of statutory construction that courts must give effect, if possible, to every clause and word of a statute").

19

The bottom line is that if Commerce does not use zeroing in a normal investigation – such as the investigation with regard to Borcelik – Commerce will calculate the same dumping margin whether it uses weighted average U.S. prices or individual U.S. transaction prices. Thus, because Commerce did not use zeroing for Borcelik, a fundamental provision of the statute – its prohibition of the average-to-transaction method for calculating dumping margins in normal investigations – was rendered completely meaningless. That cannot be the best reading of the statute.

*       *       *

Taken together, these provisions make clear that the statute is best read to require zeroing. Indeed, §1677(35)(A) defines a dumping margin as the amount by which normal value "exceeds" U.S. price, language which does not contemplate the calculation of a dumping margin where normal value is less than U.S. price. Meanwhile, in the absence of zeroing, §1677f-1(d)'s assignment of different comparison methods to different situations collapses into mathematical equivalence, depriving Congress's choice of any independent effect. Federal Circuit precedent supports these readings. *Timken* recognized that the statutory text presents a "close question" as to whether zeroing is *unambiguously* required, and *U.S. Steel* recognized that Congress may have assumed that Commerce would continue zeroing when it enacted §1677f-1(d). Therefore, under the best reading of the statute, non-dumped sales cannot generate negative dumping margins capable of offsetting dumped sales. They must be treated as generating no dumping margins at all – that is, they must be zeroed. Commerce's failure to do so was contrary to law.

**B. Commerce Erred in Its Selection of AFA for Borcelik's Home Market Inland Freight Expenses**

During Commerce's verification of Borcelik's reported selling expenses, Borcelik revealed that it had reported incorrect values for its home market inland freight expenses.

20

Borcelik Sales Verification Report at 3 (C.R. 543, P.R. 316). While Commerce accepts corrections for minor errors discovered at verification, it rejected this correction after determining that the impact of Borcelik's error was not minor. *Id.* The resulting record reflected incorrect freight expenses for Borcelik's sales. Petitioners' Sales Case Brief at 24 (C.R. 581, P.R. 339). Because necessary information was not on the record, Plaintiffs asked Commerce to use facts otherwise available to fill the gap in the record pursuant to 19 U.S.C. §1677e. Furthermore, because this gap was the result of Borcelik's failure to cooperate with Commerce's requests for information to the best of its ability, Plaintiffs asked Commerce to apply AFA and ensure that Borcelik would not benefit from its failure to cooperate. *Id.* at 25-26. Plaintiffs advised, however, that they had "tested various partial AFA adjustments related to the expense categories that Borcelik misreported and found that none accomplish the statutory purpose of deterring Borcelik's non-cooperation." *Id*. Plaintiffs therefore proposed that Commerce increase the gross unit price of Borcelik's home market sales by 5 percent, as this was "the only remedy that would ensure that Borcelik does not benefit from its failure to cooperate." *Id*.

In its Final Determination, Commerce agreed that "the record does not contain the correct value of the company's freight price adjustment{.}" IDM at 10 (P.R. 354). Commerce also agreed that "{b}ecause we were unable to verify the freight expenses as reported by Borcelik…the use of facts otherwise available is warranted." *Id.* Finally, Commerce agreed that "because Borcelik failed to accurately report the requested freight expenses, as discovered during the verification, we find that it did not act to the best of its ability, thereby justifying the application of an adverse inference." *Id.*

However, as an "adverse inference," Commerce "applied the lowest reported inland freight expense available on the record…for the relevant destination as facts available." *Id.* at 10.

21

The problem with Commerce's application of the adverse inference was that it was not actually adverse. Applying the lowest reported inland freight expenses as facts otherwise available reduced the number of Borcelik's home market sales that were made below cost, causing Borcelik's dumping margin to go down, not up. As a result of Commerce's choice of AFA, Borcelik benefitted from its non-cooperation. This was contrary to law, which requires that adjustments made pursuant to 19 U.S.C. §1677e(b) be adverse to respondents rather than beneficial.

### 1. Legal Background

The statute provides that when necessary information is not on the record or a respondent provides information that cannot be verified, Commerce shall apply "facts otherwise available" to fill the resulting gap in the record. 19 U.S.C. §1677e(a). Furthermore, if the respondent has failed to cooperate by not acting to the best of its ability to comply with a request for information, Commerce may use an adverse inference in selecting from among the facts available. 19 U.S.C. §1677e(b). Commerce employs adverse inferences "to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully." SAA at 870. Accordingly, the Federal Circuit has found that "the purpose of the adverse facts statute is to 'provide respondents with an incentive to cooperate with Commerce's investigation.'" *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1276 (Fed. Cir. 2012) (quoting *F. Ili De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000)).

Commerce enjoys discretion in applying the AFA statute. *See Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*, 624 F. Supp. 3d 1343, 1377 (Ct. Int'l Trade 2023); *Timken*, 354 F.3d at 1346. However, Commerce's discretion is not unlimited. The Federal Circuit has

22

PUBLIC VERSION

repeatedly held that when Commerce selects an AFA adjustment, it is bound by the purposes of the AFA statute. "{I}n selecting a reasonably adverse facts-available rate, Commerce must balance the statutory objectives of finding an accurate dumping margin and inducing compliance{.}" *Timken*, 354 F.3d at 1345. Because "Congress…intended for an adverse facts available rate to be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance," Commerce is not permitted to "impose punitive, aberrational, or uncorroborated margins." *F. Ili De Cecco*, 216 F.3d at 1032. But just as surely as Commerce violates the AFA statute when it imposes "punitive" AFA adjustments, it violates the statute when it imposes AFA adjustments that are beneficial, rather than adverse, to the respondent. Because "the purpose of the adverse facts statute is to provide respondents with an incentive to cooperate," *Essar Steel*, 678 F.3d at 1276, the purpose of the statute is violated when Commerce chooses an AFA adjustment that causes the respondent's dumping margin to go down, rather than up.

### 2.   Commerce's Choice of AFA Violated the Purpose of the AFA Statute

That is what happened here. Commerce induced no compliance whatsoever, because Borcelik's dumping margin shrank as a result of Commerce's choice of AFA. This effectively rewarded Borcelik's failure to cooperate, even though Congress designed the AFA statute to "ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully." SAA at 870. Commerce's decision to select an AFA adjustment that was beneficial, rather than adverse, violated the purpose of the statute.

Plaintiffs do not challenge that Commerce has discretion over whether to apply an adverse inference. *Assan Aluminyum*, 624 F. Supp. 3d at 1377. Plaintiffs also do not challenge Commerce's discretion to select among the record information when choosing an adverse

inference. 19 U.S.C. §1677e(b)(2). What Plaintiffs do contend is that having announced "the application of an adverse inference pursuant to section 776(b)(1)(A) of the Act," Commerce was bound by the statute to do what it said. IDM at 10 (P.R. 354). It was required to apply an "adverse" inference, not a beneficial inference, because it had no power under the AFA statute to adjust Borcelik's dumping margin to benefit the respondent. Such an adjustment is not contemplated by the statute. Indeed, the statutory provision granting Commerce discretion to choose "any…information placed on the record" is titled "Potential Sources of Information for *Adverse* Inferences." 19 U.S.C. §1677e(b)(2) (emphasis added). That is, it is a condition of the statute that the record information Commerce selects must be adverse to the respondent.

It can be inferred from the IDM that Commerce sought an AFA adjustment that was related to Borcelik's reporting failure. IDM at 10 (P.R. 354). Because Borcelik reported incorrect inland freight expenses for its home market sales, Commerce "applied the lowest reported inland freight expense available on the record…for the relevant destination as facts available." *Id.* By contrast, Commerce termed Plaintiffs' proposed adjustment, a simple increase in the gross price of Borcelik's home market sales, "arbitrary." *Id.* Indeed, Commerce was not obligated to select Plaintiffs' proposed adjustment, and Plaintiffs do not ask for such relief from this Court. However, Commerce *was* obligated to select an AFA adjustment that was adverse to Borcelik.

Before selecting an AFA adjustment, Commerce should have tested the impact such adjustment would have on Borcelik's dumping margin. That is what Plaintiffs did, and Plaintiffs alerted Commerce that AFA adjustments "related to the expense categories that Borcelik misreported…{did not} accomplish the statutory purpose of deterring Borcelik's non-cooperation." Petitioners' Sales Case Brief at 26 (C.R. 581, P.R. 339). Commerce ignored this warning. For Commerce, it was seemingly enough to choose an AFA adjustment "related to the

24

expense categories that Borcelik misreported," even if the actual margin impact was beneficial to Borcelik. Commerce's chosen approach – announcing an AFA adjustment only to aid the uncooperative respondent – was more "arbitrary" than choosing an adverse adjustment unrelated to the misreported expense categories. The latter would have accomplished the statutory purpose of "ensur{ing} that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully." SAA at 870. The former approach did not. For that reason, Commerce's choice of AFA adjustment was unsupported by substantial evidence and contrary to law.

## C. Commerce's Treatment of Borcelik's Internal Stock Transfers Was Unsupported by Substantial Evidence and Not in Accordance with Law

In antidumping investigations, Commerce performs a cost reconciliation in which it reconciles the respondent's reported cost to manufacture the subject merchandise ("COM") to the cost of goods sold ("COGS") recorded in the respondent's financial statements. Commerce does this in order to tie the COM, which is prepared specifically for Commerce, to the respondent's externally audited books and records. This prevents respondents from understating their costs, which tends to lower dumping margins. Commerce therefore instructs respondents to adjust their COGS by adding and subtracting certain cost elements in order to arrive at COM.

The main cost element that Commerce adjusts in reconciling COGS with COM is finished goods inventory. COGS represents the cost of goods *sold* rather than *manufactured* during a given period. It therefore includes the value of goods sold out of inventory but not manufactured during the period and conversely does not include the value of goods manufactured during the period but not sold. Accordingly, Commerce's questionnaire instructs respondents to subtract beginning finished goods inventory (*i.e.*, remove the value of goods produced before the period but sold during it) from COGS and add ending finished goods

25

inventory (*i.e.*, add the value of goods produced during the period but not sold during it). *See* Initial Questionnaire at D-13-14 (P.R. 90, 92). These operations turn COGS into a figure that better matches manufacturing costs.

Borcelik deducted beginning finished goods inventory and added ending finished goods inventory to COGS, in accordance with Commerce's instructions. However, Borcelik performed an additional operation: it deducted an item for "internal stock transfer" from COGS in the amount of $[        ]. *See* Borcelik Supplemental Section D Response (Mar. 24, 2025) at Exhibit S3-24 (C.R. 267, P.R. 217); *see also* Borcelik Cost Verification Exhibits (May 29, 2025) ("Borcelik Cost Verification Exhibits") at Exhibit CVE-4 (C.R. 504, P.R. 309); *see also* IDM at 23 (P.R. 354).

This was in error and enabled Borcelik to reconcile its COGS to an understated COM amount, lowering its dumping margin. This deduction was improper because the net value of internal stock transfers reflects actual finished goods and should not have been removed from Borcelik's finished goods inventory. Borcelik's internal stock transfers are "movements of *finished goods* between divisions and warehouses." Borcelik Cost Verification Report (July 7, 2025) at 7 (C.R. 539, P.R. 310) (emphasis added); *see also* IDM at 23 (P.R. 354). Internal stock transfers are finished goods that are temporarily transferred out of finished goods inventory for various reasons, such as to undergo additional processing, and then transferred back into finished goods inventory. By deducting net internal stock transfers, Borcelik effectively removed a portion of the company's actual finished goods from the ending inventory balance.[7] Ending

---

[7] [

                                                                    ]. [
                                                                          ].

inventory is a key component in reconciling between COGS and COM, and Borcelik's failure to include all finished goods inventory in the reconciliation understated Borcelik's cost of manufacturing and reduced its dumping margin.

Borcelik's cost verification exhibits demonstrate that [

]. [


]. [



] *Id.* For example, [




]. *Id.* [



]. *See* Borcelik Supplemental Section D Response (Mar. 24, 2025) at Exhibit S3-24 (C.R. 267, P.R. 217). By deducting internal stock transfers at the end of the calculation, Borcelik improperly canceled out an operation that [


].

Commerce's IDM correctly stated that "{a} company's ending finished goods inventory reflects the net result of the following types of inventory movement during a specific period: the cost of beginning finished goods inventory <u>plus</u> the cost of finished goods produced during the period (COM for production in) <u>less</u> the cost of finished goods sold during the period (COGS) <u>plus or minus</u> other inventory adjustment such as the transfers of finished goods in and out of

27

inventory." IDM at 23 (P.R. 354). Commerce's mistake was in believing that this required a separate operation to deduct the transfers from COGS when this net amount was already included in the value of ending finished goods inventory.

During briefing before Commerce, Borcelik argued that its method had successfully reconciled COGS to COM per Commerce's instructions and that Commerce verified Borcelik's reporting. *See* IDM at 22 (P.R. 354). The fact that Borcelik made its COGS match its COM does not provide any independent support for Borcelik's erroneous method. Rather, Borcelik's COM is unreconciled by the amount of the internal stock transfers deduction. Accordingly, Plaintiffs asked Commerce to increase Borcelik's COM by that amount. *See* Petitioners' Cost Case Brief at 22-23 (C.R. 576, P.R. 332). The Court should remand this matter to Commerce to make that adjustment.

### D. Commerce's Cost Determinations With Respect to YDC Are Unsupported by Substantial Evidence and Not in Accordance With Law

Commerce committed two related errors in its treatment of YDC's reported costs, each independently warranting remand. First, Commerce accepted YDC's reported depreciation expense based on claimed inflation-related asset revaluations that Commerce could not verify and that YDC could not document. Second, Commerce accepted YDC's gross production cost methodology despite evidence demonstrating that the [          ] of costs consisted of intermediate stage merchandise consumed in further manufacturing. Both errors violate 19 U.S.C. §1677b(f)(1)(A) because YDC's costs did not "reasonably reflect the costs associated with the production and sale" of the merchandise under consideration ("MUC"). 19 U.S.C. §1677b(f)(1)(A).

These deficiencies warranted total AFA pursuant to 19 U.S.C. §§1677e(a) and (b), both individually and collectively. Where, as here, a respondent fails to provide information necessary

28

to verify its reported costs, withholds documentation, and reports costs through a methodology that demonstrably does not reflect the merchandise sold, the statutory predicate for total AFA is satisfied. 19 U.S.C. §1677e(a) (authorizing use of facts otherwise available when necessary information is not available on the record or a party provides information that cannot be verified); §1677e(b) (authorizing adverse inferences when a party fails to cooperate to the best of its ability). Alternatively, even if total AFA was not warranted, Commerce was obligated to adjust YDC's reported costs to eliminate the distortions in such costs. Reported costs that do not reasonably reflect the costs associated with the production and sale of MUC cannot serve as the basis for Commerce's antidumping calculations without adjustment, and Commerce's failure to make any adjustment to YDC's reported costs – whether through facts available or through correction of the reported cost data – was contrary to law and cannot be sustained. SAA, H.R. Doc. 103-316, at 834-35 (1994); *Thai Plastic Bags Industries Co. v. United States*, 746 F.3d 1359, 1366 (Fed. Cir. 2014).

### 1. Commerce Erred in Concluding That YDC's Reported Depreciation Expense Reflected Inflation-Adjusted Asset Values

Commerce acted unlawfully by accepting YDC's depreciation expense based on purported inflation-related asset revaluations that Commerce could not verify. Plaintiffs demonstrated that depreciation calculated using historical asset values would materially understate the economic cost associated with productive assets under the severe inflationary conditions that existed in Türkiye during the period of investigation ("POI"). Petitioners' Cost Case Brief at 37-38 (C.R. 576, P.R. 332). Plaintiffs therefore requested that Commerce adjust YDC's reported depreciation expense to account for the loss of purchasing power. *Id*. at 38-39.

Commerce rejected Plaintiffs' proposed adjustment, concluding that YDC had already revalued its fixed assets quarterly since December 2021 and that Plaintiffs' methodology would

29

PUBLIC VERSION

improperly double count the effects of inflation already reflected in YDC's records. IDM at 31-32 (P.R. 354). According to Commerce, because YDC periodically revalued its fixed assets pursuant to Turkish accounting requirements, additional inflation adjustments were unnecessary. *Id.* That conclusion, however, is unsupported by substantial evidence.

Commerce's conclusion was premised on YDC's assertion that its fixed assets had been periodically revalued and that those revaluations were incorporated into its reported depreciation expense. However, Commerce simultaneously acknowledged that YDC could not provide documentation to support its assertion because it "did not keep revaluation schedules of the fixed assets." IDM at 31-32 (P.R. 354). Thus, Commerce accepted YDC's claim that inflation had already been reflected in the reported depreciation expense without verifying the very revaluations upon which that claim depended.

This failure is particularly significant because depreciation is a derived expense that depends entirely on the underlying asset base. If those asset values are inaccurate or inadequately revalued, the resulting depreciation expense cannot reasonably reflect production costs. For example, an asset purchased for $100 million and depreciated over 20 years generates $5 million in annual depreciation under historical cost, but depreciation climbs to approximately $15 million if inflation increases its replacement value to $300 million. Whether depreciation is $5 million or $15 million depends entirely on whether the underlying asset value has been properly revalued. In a high-inflation environment such as Türkiye during the POI, the gap between historical and inflation-adjusted asset values is particularly acute, making the documentation failure here far more consequential than it would be under stable-price conditions.

This failure goes directly to the accuracy of Commerce's antidumping analysis. Because depreciation is a component of manufacturing costs, it directly affects reported cost of

PUBLIC VERSION

production ("COP") and constructed value ("CV"). If the depreciation expense is understated because the underlying asset values do not adequately reflect inflation, the reported costs of producing subject merchandise will likewise be understated. That understatement can artificially reduce or eliminate below-cost sales, lower COP and CV, and ultimately reduce the dumping margin.

According to YDC, the company was unable to reconstruct the underlying revaluation adjustments because its fixed-asset software replaced historical asset values with revalued amounts and did not permit the preparation of a separate inflation-stripped depreciation calculation. YDC's Rebuttal Cost Case Brief (July 24, 2025) at 29 (C.R. 582, P.R. 341). This explanation only underscores the problem. If YDC could not reconstruct the underlying revaluations, then neither Commerce nor Plaintiffs could determine which assets were revalued, the magnitude of those revaluations, or the extent to which those revaluations were incorporated into the reported depreciation expense. Nor does the record identify alternative documentation that would permit Commerce to independently verify the claimed revaluations and their effect on depreciation expense.

Commerce ultimately accepted YDC's assertion that prior fixed-asset revaluations were fully incorporated into reported depreciation despite the absence of crucial documentation. At verification, Commerce confirmed that the inflation adjustment reflected in YDC's financial statements related to inventories rather than depreciation expenses. YDC Cost Verification Report at 6 (C.R. 540, P.R. 313). YDC explained that fixed-asset revaluations were performed several years before the POI and that the reported depreciation expense purportedly included the effects of those revaluations. *Id.* However, YDC simultaneously acknowledged that it did not maintain revaluation schedules identifying the affected assets. *Id.*

PUBLIC VERSION

Respondents bear the burden of substantiating factual assertions that would support a claimed reporting methodology or adjustment. *Unicatch Industrial Co., Ltd. v. United States*, 539 F.Supp.3d 1229, 1246 (Ct. Int'l Trade 2021); *see also QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011); *Hyundai Steel Co. v. United States*, 319 F.Supp.3d 1327, 1345 (Ct. Int'l Trade 2018). Because YDC affirmatively claimed that its reported depreciation already reflected inflation-adjusted asset values, the burden was on YDC to document those revaluations through contemporaneous schedules or other evidence tracing the revaluations to specific assets and depreciation calculations.

Moreover, Commerce may not rely upon unsupported factual assertions and must base its determinations on substantial evidence contained in the record. *Garg Tube Export LLP v. United States*, 569 F.Supp.3d 1202, 1215 (Ct. Int'l Trade 2022); *HiSteel Co., Ltd. v. United States*, 547 F.Supp.3d 1233, 1241 (Ct. Int'l Trade 2021). Here, Commerce accepted YDC's assertion that its depreciation expense reflected inflation-adjusted asset values even though the underlying revaluations could not be substantiated through contemporaneous revaluation schedules or other evidence. YDC's failure to provide that documentation left Commerce with no evidentiary basis upon which to accept YDC's claim and its reported depreciation.

### 2. Commerce Erred in Determining That YDC Appropriately Included Semi-Finished Goods in Its Cost Database

Commerce's handling of YDC's depreciation expense is not an isolated error. Commerce made the same fundamental mistake with respect to YDC's reported production costs by accepting a gross production methodology that likewise failed to reasonably reflect the costs associated with the merchandise sold.

Although Commerce generally relies upon a respondent's normal books and records, it may do so only where those records reasonably reflect the costs associated with the production

and sale of the MUC. 19 U.S.C. §1677b(f)(1)(A); *Saha Thai Steel Pipe (Public) Co. v. United States*, 635 F.3d 1335, 1341 (Fed. Cir. 2011); *Thai Pineapple Public Co. v. United States*, 187 F.3d 1362, 1367 (Fed. Cir. 1999); *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1206 (Fed. Cir. 1995). YDC included SFG in its cost database and Commerce accepted YDC's gross production methodology despite record evidence demonstrating that this methodology distorted YDC's costs. IDM at 29-31 (P.R. 354). YDC's methodology distorted reported costs because it incorporated substantial quantities of SFG that was later consumed in additional manufacturing operations. Petitioners' Cost Case Brief at 23-29 (C.R. 576, P.R. 332). Commerce nevertheless accepted YDC's methodology and declined to apply facts available or otherwise adjust the reported costs. IDM at 29-31 (P.R. 354). Its decision was based on three findings: (1) some SFG constituted MUC and was sometimes sold; (2) YDC could not isolate the net production quantities of finished goods; and (3) inclusion of SFG in YDC's cost database did not distort YDC's reported costs. *Id.* These findings conflict with the record evidence and fail to support Commerce's decision.

### a) YDC Improperly Reported Gross Production that Included Both Final Merchandise and SFG

Plaintiffs do not contend that saleable SFG should be excluded from the cost database merely because it is semi-finished. Rather, Plaintiffs contend that YDC improperly reported a gross production cost universe that included substantial quantities of merchandise that was subsequently consumed in later production stages, combining intermediate and final stage production within the same cost framework. The issue is therefore not whether certain SFG constituted MUC, but whether YDC's reported costs reasonably reflect the costs associated with the production of the merchandise ultimately sold during the POI. The statute focuses on the

33

costs associated with the merchandise sold, not the volume of manufacturing activity occurring within the production process.

Contrary to Commerce's finding, the record demonstrates that YDC was capable of isolating the net production quantities of finished goods. YDC acknowledged that its accounting system separately tracked production and consumption throughout the manufacturing process. YDC's Supplemental Section D Response (Mar. 24, 2025) at S3-6 (C.R. 282, P.R. 218). As YDC explained, products could be produced as SFG, consumed in subsequent manufacturing operations, and later emerge as finished merchandise. *Id*. YDC further admitted that because the same steel coil could pass through multiple production stages, its records separately tracked both "production" and "consumption for production." *Id*. Thus, YDC admitted that a net production methodology existed and that it knew how to calculate it. Nevertheless, YDC elected to report gross production.

Two exhibits from YDC's initial response to Section D of Commerce's questionnaire establish this capability clearly. In Exhibit D-19, YDC included an inventory movement table that [

]. YDC's Initial Section D Response (Dec. 23, 2024) at Exhibit D-19 (C.R. 142, P.R. 140). Critically, the table [

]. *Id.* By maintaining separate inventory records for [                              ], YDC's system tracks each stage of production as a distinct cost layer. The table also [

34

PUBLIC VERSION

], meaning YDC can calculate and verify the per-unit cost of each product at each production stage. *Id.* Exhibit D-19 further demonstrates that YDC's system [

]. *Id.* [

]. *Id.* This means that the [

]. YDC is therefore [

].

Exhibit D-15 confirms that these inventory records were fully integrated into YDC's broader cost-accounting system. In that exhibit, YDC reconciled its statutory financial accounting costs to the costs reported to Commerce and arrived at a [                ]. *Id*. at Exhibit D-15. The reconciliation [

]. *Id*. A reconciliation of this precision [                        ], spanning a full 12-month period, would not be possible if YDC's system were incapable of accurately isolating finished goods production costs. Thus, the record demonstrates not only that the information necessary to isolate net production existed but that YDC itself used that information to calculate net production. Commerce's conclusion otherwise conflicts with the record evidence.

Commerce verified that YDC's cost accounting system separately identified (1) "net COM of MUC" and (2) the COM associated with the SFG consumed. YDC Cost Verification Report at 7 (C.R. 540, P.R. 313). YDC's net COM of MUC totaled approximately [

] of costs associated with consumed SFG to arrive at a reported gross production COM of approximately [

PUBLIC VERSION

]. *Id*. at 6. Approximately [    ] percent of YDC's reported costs consisted of merchandise that YDC itself identified as consumed SFG. *Id*.[8] Thus, the [          ] of the reported production universe did not consist of final merchandise but rather consisted of intermediate stage merchandise that was subsequently consumed. *Id.*

Verification further demonstrated that YDC separately tracked these production stages within its accounting system. Commerce verified that YDC's records distinguished between semi-finished and finished products and that YDC separately maintained cost build-ups reflecting these stages of production. *Id.* at 7. For example, Commerce observed that control number ("CONNUM") 1 included both SFG product "GHRS" and finished-good product "GHRP," with the latter reflecting an additional production stage. *Id.* Therefore, this is not a case in which the respondent lacked the information necessary to distinguish between intermediate and final production. To the contrary, YDC's own records separately tracked these categories and expressly identified merchandise that was consumed. Commerce nevertheless concluded that YDC lacked the capability to isolate net production quantities. That conclusion is irreconcilable with the record.

### b) The Inclusion of SFG Distorted YDC's Costs

Commerce concluded that no distortion existed in YDC's reported costs because both the production quantities and costs associated with SFG were included in the reported cost calculations. IDM at 29-31 (P.R. 354). However, this misses the point. The issue here, which Commerce never addressed, is whether a methodology driven by gross production reasonably reflects the costs associated with the merchandise sold.

---

[8] [                                                                    ].

PUBLIC VERSION

Commerce verified that YDC incorporated approximately [                    ] of consumed SFG costs into its reported gross production universe, compared to [                    ] of net COM associated with MUC. Thus, the challenged component [                    ] of the net COM associated with the merchandise that ultimately exited production and represented approximately [    ] percent of the reported gross production universe. YDC Cost Verification Report at 6 (C.R. 540, P.R. 313). Yet Commerce never explained why a cost methodology driven principally by consumed intermediate stage production reasonably reflects the costs associated with the merchandise sold. Nor did Commerce determine what proportion of the reported SFG was actually sold as MUC versus subsequently consumed.

This distinction is particularly important in the context of Commerce's high-inflation methodology. Commerce's replacement cost methodology relies upon production quantities and production costs as weighting factors in calculating inflation-adjusted costs. Where intermediate stage production is combined with final stage production, the resulting weights no longer correspond to actual final merchandise output. Instead, they reflect a mixture of intermediate production and final production. By including [                    ] of costs associated with consumed SFG in the reported gross production universe, YDC incorporated substantial quantities of intermediate stage production that were subsequently transformed through additional manufacturing operations before final sale. Commerce's rationale that some SFG were sold as MUC does not resolve this problem. The existence of some sales of SFG does not justify including all consumed SFG production in the reported gross production universe, particularly where YDC separately tracked those consumed quantities and acknowledged that a net production methodology could be calculated. Nor does the fact that consumed SFG may

37

technically constitute MUC answer the relevant statutory question of whether the reported costs reasonably reflect the costs associated with the production of the merchandise sold.

Plaintiffs showed that including production quantities and costs associated with merchandise subsequently consumed in further production distorted the weighting factors used in Commerce's high-inflation methodology and therefore distorted the resulting weighted-average costs. Petitioners' Cost Case Brief at 25-29 (C.R. 576, P.R. 332). Commerce rejected Plaintiffs' analysis on the ground that it purportedly relied upon hypothetical quantities "that were not referenced to anything on the record." IDM at 29-31 (P.R. 354). This is simply incorrect. Plaintiffs used specific data reported by YDC in Exhibit S3-28 of its Section D supplemental questionnaire response. Petitioners' Cost Case Brief at 25-29 (C.R. 576, P.R. 332). Plaintiffs showed that for CONNUM [                                    ], YDC reported [

                                                                                        ] percent. *Id.*

Plaintiffs demonstrated using the same CONNUM how much the weighted-average costs can change when semi-finished production is excluded under Commerce's high-inflation methodology. Excluding SFG resulted in a difference in the annual average COM of [    ] percent. *Id.*

By expanding the production base over which costs are allocated, YDC's methodology dilutes the costs associated with the merchandise ultimately sold. Because these reported costs directly affect Commerce's normal value calculations, any understatement of per-unit costs can lower the normal value. A lower normal value, in turn, reduces the calculated dumping margin. Thus, YDC's gross production methodology does not merely affect internal accounting

38

classifications. It directly impacts the dumping analysis by understating the costs associated with the merchandise sold and reducing the resulting dumping margins.

In short, the record demonstrates that YDC separately tracked net production, separately tracked consumed SFG, separately identified the costs associated with those consumed SFG, and possessed the ability to calculate net production. Verification further established that consumed SFG represented approximately [   ] percent of YDC's reported gross production cost universe. YDC Cost Verification Report at 6 (C.R. 540, P.R. 313). Under these circumstances, Commerce's acceptance of YDC's gross production methodology resulted in a cost database that incorporated substantial quantities of intermediate stage merchandise that was consumed in further production and therefore did not reasonably reflect the costs associated with the production of the MUC.

### 3.  Commerce's Cost Determinations Are Contrary to Law

Commerce's acceptance of both YDC's unverified depreciation methodology and its gross production methodology contravene the governing legal standard. The statute requires that costs "reasonably reflect the costs associated with the production and sale of the merchandise," 19 U.S.C. §1677b(f)(1)(A), and the SAA makes clear that "costs shall be allocated using a method that reasonably reflects and accurately captures all of the actual costs incurred in producing and selling the product under investigation or review." SAA at 834-35. The Federal Circuit has given teeth to this standard. In *Thai Plastic Bags*, the court affirmed Commerce's rejection of a respondent's cost methodology precisely because it produced anomalous variability untethered from actual production differences, reasoning that a methodology that distorts the overall dumping analysis by failing to align cost and price comparisons cannot satisfy the "reasonably reflect" requirement. *Thai Plastic Bags Industries Co. v. United States*, 746 F.3d

PUBLIC VERSION

1359, 1366 (Fed. Cir. 2014). That principle applies with equal force here. With respect to depreciation, the statute does not require merely that some revaluation activity occurred at some point in the past. It requires that the reported depreciation expense, as submitted to Commerce, reasonably reflects the actual cost of using productive assets during the POI. With respect to the gross production methodology, the statute does not require merely that costs be recorded somewhere in the respondent's system. It requires that the reported costs reasonably reflect the costs associated with the merchandise sold. SAA at 834-35; *Thai Plastic Bags*, 746 F.3d at 1366. Commerce's determinations fail these tests.

Commerce's errors have a compounding effect on the dumping margin. YDC's failure to document its asset revaluations means that the depreciation component of its reported costs may significantly understate the true economic cost of production in a high-inflation environment. YDC's gross production methodology separately dilutes per-unit costs by spreading them across a production base that includes approximately [   ] percent intermediate stage merchandise. Each error independently suppresses reported costs and therefore independently suppresses the calculated dumping margin. Considered together, they compound in producing a reported cost structure that understates the true cost of producing the merchandise sold.

Commerce's determination also is not supported by substantial evidence. With respect to depreciation, Commerce's failure to verify the claimed revaluations, combined with YDC's acknowledgment that the underlying documentation does not exist, leaves Commerce's acceptance of YDC's depreciation methodology without substantial evidentiary support. As for the gross production methodology, where record evidence demonstrates that a respondent possessed the capability to isolate net production costs and acknowledged that a net production methodology existed, Commerce cannot simply accept gross production reporting. *Nippon Steel*

40

PUBLIC VERSION

*Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003) (Commerce must use the best available information and a respondent's demonstrated capability to produce data bears directly on that obligation); *cf. Tung Fong Indus. Co. v. United States*, Slip Op. 04-32 (Ct. Int'l Trade 2004) (by analogy, Commerce's finding that a respondent lacked capability to provide an alternative cost allocation cannot stand where the record demonstrates otherwise). Moreover, the distortive effect of YDC's gross production methodology is particularly acute in the context of Commerce's high-inflation cost averaging methodology, which relies on production quantities and costs as weighting factors. As demonstrated above, YDC's methodology distorted the very weighting mechanism upon which Commerce's high-inflation calculations depend.

Commerce's failure to address the distortions in YDC's costs, or to apply facts available under 19 U.S.C. §1677e(a) in response to the evidentiary gaps identified by Plaintiffs, renders its determinations with respect to both depreciation and the gross production cost methodology unsupported by substantial evidence and not in accordance with law.

Because YDC's reported COP and CV data are fundamentally unreliable, Commerce should have found that crucial information was missing from the record and applied total AFA to YDC pursuant to 19 U.S.C. §1677e(a). YDC's inclusion of SFG quantities and costs in its reported cost database rendered the cost data unusable and left the record devoid of the information necessary to calculate accurate CONNUM-specific costs. This failure satisfied 19 U.S.C. §1677e(a)(1) because the necessary information to calculate an accurate COP and CV was not available on the record, and it satisfied multiple subparts of §1677e(a)(2) because YDC withheld requested information, failed to provide it in the form and manner required, and significantly impeded the proceeding by submitting a cost database that could not support reliable margin calculations. Moreover, because these record gaps existed due to YDC's failure

41

to cooperate to the best of its ability despite possessing the accounting systems and technical capacity to report accurate costs, an adverse inference was warranted under §1677e(b).

Commerce's practice is to reject a respondent's submission in its entirety when a substantial portion of the reported information cannot be reliably used, and the systemic nature of the flaws in YDC's cost database made total AFA the only appropriate course of action. Should Commerce on remand decline to apply total AFA, it should at a minimum adjust YDC's reported CONNUM-specific costs using the highest percentage difference between monthly TOTCOMs for the affected CONNUMs and separately adjust YDC's reported depreciation expense to reflect the loss of purchasing power for each month of the POI. These adjustments address distinct deficiencies and should be applied together in the event that total AFA is not applied.

### E. Commerce's Date-of-Sale Determination Is Unsupported by Substantial Evidence and Contrary to Law

Commerce acted unlawfully in reversing its preliminary determination and adopting the earlier of commercial invoice date or shipment date as the date of sale for YDC's U.S. sales. IDM at 32-34 (P.R. 354). In the preliminary determination, Commerce correctly relied on the pro-forma invoice date as the date of sale. Preliminary Decision Memorandum at 12 (P.R. 228). The record contains repeated, certified admissions by YDC that the pro-forma invoice is issued only after agreement is reached on all material terms of sale and that the material terms do not change thereafter. YDC's Supplemental Section A Response (Jan. 16, 2025) ("YDC Section A Supp. Response") at 12-14 (C.R. 157, P.R. 170). Indeed, YDC stated as follows in a questionnaire response that it certified to be accurate:

> YDC does not revise the orders after the proforma invoice. Since
> the orders have been finalized with approval from the Raw
> Material Planning Department, no changes will be accepted after

42

> the price is determined. Any change will require a new delivery date, as it affects the raw material procurement plan. In case such changes occur, the proforma invoice and all other order procedures should be revised.

*Id.* at 12. Commerce's reversal in the final determination rests on at most a single verified instance of a change after the pro-forma invoice – one that Commerce itself characterized as involving a tolerance-level adjustment. IDM at Comment 13 (P.R. 354). An agency determination that reverses a well-supported preliminary finding must be grounded in substantial evidence viewed against the record as a whole, and must provide a reasoned explanation for the departure. A single marginal exception to an otherwise consistent commercial practice satisfies neither requirement. *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006); *Glycine & More, Inc. v. United States*, 880 F.3d 1335, 1345 (Fed. Cir. 2018) (Commerce must provide a reasoned explanation when it changes its methodology between the preliminary and final determination); *NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1320 (Fed. Cir. 2009).

### 1. The Pro-Forma Invoice Date Was the Proper Date of Sale

Commerce's regulations provide that Commerce will select a date of sale based on the date on which the exporter or producer establishes the material terms of sale. 19 C.F.R. §351.401(i). The material terms of sale generally consist of price and quantity. *Allied Tube & Conduit Corp. v. United States*, 374 F. Supp. 2d 1257, 1261 (Ct. Int'l Trade 2005); *Tianjin Mach. Imp. & Exp. Corp. v. United States*, 28 CIT 1635, 1642 (2004).

Here, the record contains YDC's own repeated, certified representations that its pro-forma invoice is issued only after the parties have reached agreement on all material terms, that YDC "does not revise the orders after the pro forma invoice" is issued, and that the pro-forma invoice contains "the ultimate quality, quantity, and price" and serves as the date on which

43

"agreed material sales terms" are established. YDC Section A Supp. Response at A-16.

Commerce's preliminary determination correctly recognized the significance of those admissions

and relied on pro-forma invoice date accordingly. Where a respondent's own certified

representations establish that the material terms are fixed at a particular point in time and do not

change thereafter, the regulatory standard is satisfied. *Sahaviriya Steel Indus. Public Co. v.*

*United States*, 649 F.3d 1371, 1375 (Fed. Cir. 2011) (recognizing that the date of sale inquiry

turns on when material terms were established and ceased to be subject to change); *Hangzhou*

*Spring Washer Co. v. United States*, 387 F. Supp. 2d 1236, 1245 (Ct. Int'l Trade 2005)

(upholding reliance on the date reflected in respondent's business records as the date of sale

where those records consistently reflected establishment of material terms).

### 2.   A Single Tolerance-Level Adjustment Was Not Sufficient to Deviate from the Pro-Forma Invoice Date

Despite the strength of the preliminary record, Commerce reversed course in the Final

Determination based on what appears to be, at most, a single verified instance of a post-pro-

forma invoice change that Commerce itself characterized as involving a tolerance-level

adjustment. IDM at 32-34 (P.R. 354). That is an insufficient evidentiary basis for abandoning a

methodology that was supported by the respondent's own certified admissions, other evidentiary

records, and Commerce's preliminary finding.

The CIT and the Federal Circuit have made clear that substantial evidence requires "more

than a mere scintilla" and must be sufficient to justify the conclusion reached when viewed

against the record as a whole, including evidence that detracts from the agency's determination.

*Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006); *Consolo v. Fed. Mar.*

*Comm'n*, 383 U.S. 607, 620 (1966). A single instance of a post-pro-forma invoice adjustment

does not constitute substantial evidence sufficient to override repeated, certified respondent

44

admissions that the material terms are fixed at the pro-forma invoice stage and do not change thereafter, particularly where Commerce's own findings simultaneously establish that all other identified post-pro-forma invoice changes were immaterial. *Sahaviriya Steel Industries Public Co. Ltd. v. United States*, 714 F.Supp.2d 1263, 1280 (upholding reliance on contract date as date of sale despite the fact that one sale fell outside quantity tolerance limits set in the contract, on the ground that a single deviation from an otherwise consistent commercial practice does not undermine the reliability of the date on which material terms were established); *see also Jacobi Carbons AB v. United States*, 222 F. Supp. 3d 1159, 1171 (Ct. Int'l Trade 2017) (remanding where Commerce's date of sale determination failed to adequately account for the weight of record evidence supporting the preliminary methodology); *Ferrostaal Metals GmbH v. United States*, 518 F. Supp. 2d 1353, 1362 (Ct. Int'l Trade 2007) (holding that Commerce's date of sale determination must be grounded in a reasoned analysis of when material terms were established based on the record as a whole).

Commerce's reliance on the tolerance-level adjustment is further undermined by its own treatment of the other post-pro-forma invoice changes identified in the record. Commerce did not find that those other changes were material. To the contrary, Commerce affirmatively determined that they were not. IDM at 32-34 (P.R. 354). That means Commerce's own findings, taken together, establish that the tolerance-level adjustment was the only material post-pro-forma invoice change Commerce could identify across the entire record. Commerce's own findings thus confirm that the pro-forma invoice date accurately reflected the establishment of material terms for all of YDC's sales except, at most, the single transaction involving the tolerance adjustment. An agency that identifies a single exception to an otherwise consistent commercial practice cannot reasonably treat that exception as sufficient justification to abandon the

45

PUBLIC VERSION

methodology wholesale, and Commerce's failure to provide a reasoned explanation for doing so independently renders its determination unsupported and contrary to law. *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 290 (1974) (an agency must cogently explain why it has exercised its discretion in a given manner and cannot reach a conclusion disproportionate to the evidence on which it relies); *see also NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1320 (Fed. Cir. 2009) (Commerce's departure from its preliminary methodology in the final determination must be supported by a reasoned explanation grounded in the record).

Commerce's determination to change the date of sale methodology for all of YDC's U.S. sales based on a single tolerance-level adjustment – while simultaneously finding that all other post-pro-forma invoice changes were immaterial – is not the product of reasoned agency decision-making. It therefore cannot be sustained.

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court to remand this action to Commerce for reconsideration of the issues discussed above.

*          *          *

46

PUBLIC VERSION

Respectfully submitted,

/s/ Jeffrey D. Gerrish
Roger B. Schagrin
Jeffrey D. Gerrish
Maliha Khan
Nicholas C. Phillips*
**SCHAGRIN ASSOCIATES**

/s/ Alan H. Price
Alan H. Price
Christopher B. Weld
Stephanie M. Bell
**WILEY REIN LLP**

/s/ Thomas M. Beline
Thomas M. Beline
Myles S. Getlan
Mary Jane Alves
Roop K. Bhatti
Nicole Brunda
Margaret E. Monday
**CASSIDY LEVY KENT (USA) LLP**

*Counsel to Steel Dynamics, Inc. and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC*

*Counsel to Nucor Corporation*

*Counsel to United States Steel Corporation*

*Only admitted in New York. Practice limited to federal courts and agencies.

47

PUBLIC VERSION

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief contains 13,933 words (including text, quotations, footnotes, headings, and attachments) and therefore complies with the word limitation set forth in this Court's Chamber's Procedures. In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.

Dated:  July 10, 2026                              /s/ Jeffrey D. Gerrish
                                                        Jeffrey D. Gerrish

# UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

|  |  |  |
|---|---|---|
| BORÇELIK ÇELIK SANAYII TICARET A.Ş.; ARCELORMITTAL ÇELIK TICARET A.Ş.; BAMESA CELIK SERVIS SAN. VE TIC. A.Ş.; AND BAMESA MURADIYE DEMIR ÇELIK SAN. VE TIC. A.Ş., | ) ) ) ) ) ) ) | |
| *Plaintiffs,* | ) ) | |
| *and* | ) ) | |
| YILDIZ DEMIR ÇELIK SANAYI A.S.; YILDIZ ENTEGRE AGAÇ SANAYI VE TICARET A.S.; STEEL DYNAMICS, INC.; AND UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, | ) ) ) ) ) ) ) ) ) ) | Consol. Court No. 26-00722 |
| *Consolidated Plaintiffs,* | ) ) | |
| *and* | ) ) | |
| UNITED STATES STEEL CORPORATION AND NUCOR CORPORATION, | ) ) ) | |
| *Plaintiff-Intervenors,* | ) ) | |
| *v.* | ) ) | |
| UNITED STATES, | ) ) | |
| *Defendant,* | ) ) | |
| *and* | ) ) | |
| STEEL DYNAMICS, INC.; UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, | ) ) ) ) ) ) | |

AFL-CIO, CLC; UNITED STATES                )
STEEL CORPORATION; NUCOR                  )
CORPORATION; BORÇELIK ÇELIK               )
SANAYII TICARET A.Ş.;                     )
ARCELORMITTAL ÇELIK TICARET A.Ş.;         )
BAMESA CELIK SERVIS SAN. VE TIC.          )
A.Ş.; AND BAMESA MURADIYE DEMIR           )
ÇELIK SAN. VE TIC. A.Ş.,                  )
                                          )
                *Defendant-Intervenors.*   )
_____   )

## ORDER

Upon consideration of the Rule 56.2 motion for judgment on the agency record submitted by Consolidated Plaintiffs Steel Dynamics, Inc. and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC and Plaintiff-Intervenors United States Steel Corporation and Nucor Corporation, the responses in opposition, and all other papers and pleadings herein, it is hereby

**ORDERED** that the motion is granted, and it is further

**ORDERED** that the challenged decision of the U.S. Department of Commerce is remanded for reconsideration in accordance with this opinion.

                                                _____

                                               Hon. Jennifer Choe-Groves, Judge

Dated: _____, 2026
          New York, New York