# THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| BORÇELIK ÇELIK SANAYII TICARET A.Ş. ET AL.,, <br><br> Plaintiffs and, Consolidated Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> STEEL DYNAMICS INC. ET AL., <br><br> Defendant-Intervenors and Consolidated Defendant-Intervenors. | Court No. 26-00722 <br><br> Before:    Hon. Jennifer Choe-Groves, Judge <br><br> Non-Confidential Version <br><br> Confidential Information Redacted on pages: 11 and 55. |

## MEMORANDUM OF LAW IN SUPPORT OF CONSOLIDATED PLAINTIFFS' RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD

Jonathan M. Freed
Kenneth N. Hammer
Aqmar Rahman

**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE,
Suite 500
Washington, D.C.  20003
(202) 223-3760

Dated: July 10, 2026

*Counsel to Consolidated Plaintiffs
Yildiz Demir Çelik Sanayi A.Ş. and
Yildiz Entegre AGAÇ Sanayi ve
Ticarat A.Ş.*

4

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................ii

Statement Pursuant To Rule 56.2(c) ......................................................... 1
I.     Administrative Determination Under Review ............................... 1
II.    Issues Presented......................................................................... 2
III.   Standard of Review ..................................................................... 4
IV.    Statement of Facts ...................................................................... 7

SUMMARY OF ARGUMENT................................................................. 17
         A.     Commerce Unlawfully Applied 19 C.F.R.
                § 351.519 to Conclude that the Full Value of CS
                Wind's Import Duty Exemptions Under the LMW
                Program Were Countervailable ................................... 17
         B.     Commerce Unlawfully Denied CS Wind an
                Entered Value Adjustment........................................... 21

Argument ................................................................................................ 23
I.     Commerce Unlawfully Declined to Grant YDC a Duty
       Drawback Adjustment for Imports Subject to Closed Inward
       Processing Certificates................................................................ 23
         A.     Legal Standard ........................................................... 24
         B.     The Statute Requires a Duty Drawback
                Adjustment to U.S.Price for All IPCs YDC
                Demonstrated Were Closed and Linked to
                Reported Exports of Subject Merchandise ................. 26
         C.     Commerce's Practice Does Not Reflect the Period
                of Investigation Closure Limitation Applied in
                this Investigation........................................................ 28
         D.     Commerce's Denial of the Duty Drawback
                Adjustment for Closed IPCs Based on its Period
                of Investigation Time Limitation is
                Unreasonable, Arbitrary, and Capricious ................... 35
II.    Commerce's Calculation of YDC's Interest Expense Ratio by
       Including YEs Net Monetary Is Unlawful and Not Supported
       by Substantial Evidence ............................................................. 52
III.   CONCLUSION ........................................................................... 57

# TABLE OF AUTHORITIES

**STATUTES**

19 U.S.C. § 1516a(b)(1)(B)(i) ........................................................ 4

5 U.S.C. § 706(2)(A) ...................................................................... 4

19 U.S.C. § 1677a(c)(1)(B) ......................................... 17, 18, 24,26–28, 45

19 U.S.C. § 1671(c)(1)(B) ............................................................ 38

**REGULATIONS**

19 C.F.R. § 351.414(f) ................................................................ 40

**CASES**

*Loper Bright Enterprises v. Raimondo,* 144 S.Ct. 2244, 2273 (2024)  4, 28

*Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 636 F. Supp. 961 (1986) ..................................................................... 5

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) ........ 5

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013) ................................................................ 5

*SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001).... 5

*Rhone-Poulenc, Inc. United States*, 20 CIT 573, 575, 927 F. Supp. 451, 454 (1996).............................................................................. 5

*Asociacion Colombiana de Exportadores de Flores v. United States*, 2 CIT 173, 6 F. Supp. 2d 865 (1998) ................................... 6, 19, 35

*Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607 (1966) ........................ 6

*Consolidated Edison Co. of New York v. NLRB*, 305 U.S. 197 (1938) ..... 6

*PAM, S.p.A. v. United States*, 582 F.3d 1336 (Fed. Cir. 2009) ................ 6

*Nucor Corp. v. United States*, 32 CIT 1380, 594 F. Supp. 2d 1320 (2008) ................................................................................................ 6

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) .................. 6

*Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*, Consol. Ct. No. 21-00246; Slip Op. 24-44 (CIT Apr. 11, 2024) ................................ 19

*Tosçelik Profil ve Sac Endüstrasi A.Ş. v. United States*, 348 F.Supp.3d 1321 (Ct. Intl. Trade 2018) .................................. 20, 33, 39, 42, 44, 45, 51

*Uttam Galva Steels Ltd. v. United States*, 977 F.3d 1192 (Fed. Cir. 2021) .............................................................................................. 24, 28

*Saha Thai Steel Pipe (Public) Company Ltd. v. United States*, 635 F.3d 1335 (Fed. Cir. 2011) .............................................................. 24

*Thai Steel Pipe (Public) Company Ltd. v. United States*, 635 F.3d 1335, 1340–41 (Fed. Cir. 2011) ....................................................... 24

*Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*, 48 CIT __, 701 F.Supp.3d 1321 (2024) ..................................................... 30

*Habas Sinai ve Tibbi Gazlar Istihsal Endüstrisi, A.Ş. v. United States*, 44 CIT __, 439 F.Supp.3d 1342 (2020) .............................. 30, 32

*Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*, 44 CIT __, 789 F.Supp.3d 1257 (2025) ............................................... 34, 35

*Icdas Celik Enerji Tersanev e Ulasim Sanayi A.S. v. United States*, 654 F.Supp.3d 1311 (Ct. Intl. Trade 2023) ................................ 34

*Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185 (Fed. Cir. 1990) .. 45

## ADMINISTRATIVE DETERMINATIONS

*Certain Corrosion-Resistant Steel Products From the Republic of Türkiye*, 90 Fed. Reg. 42,216 (Dep't Commerce Aug. 29, 2025), and accompanying Decision Memorandum (Aug. 25, 2025) ...................... 2, 14,17, 21, 23, 24–26, 36, 37, 39, 41, 42–44, 46, 48, 49, 52

*Corrosion-Resistant Steel Products From Australia Brazil, Canada Mexico, the Netherlands, South Africa, Taiwan, the Republic of Türkiye, the United Arab Emirates, and the Socialist Republic of Vietnam*, 90 Fed. Reg. 59,494 (antidumping duty orders) .................................... 2, 16

*Certain Corrosion-Resistant Steel Products From the Republic of Türkiye*, 90 Fed. Reg. 15,340 (Dep't Commerce Apr. 10, 2025) (preliminary affirmative determination of sales at less than fair value, postponement of final determination, and extension of provisional measures), and accompanying Decision Memorandum (Apr. 3, 2025) ............................................................................................ 10, 11, 35

*Notice of Final Results of Antidumping Duty Administrative Review: Fresh Atlantic Salmon from Chile*, 65 Fed. Reg. 87472, (Dec. 15, 2000) and accompanying Issues and Decision Memorandum (Dec. 8, 2000) .............................................................................. 21, 52, 53, 54, 56

*Notice of Final Determination of Sales at Less Than Fair Value: Emulsion Styrene-Butadiene Rubber From Mexico,* 64 Fed. Reg. 14872, 14882 (Mar. 29, 1999)......................................................... 22, 53, 54, 56

*Common Alloy Aluminum Sheet From the Republic of Türkiye*, 89 Fed. Reg. 89,965 (Dep't Commerce Nov. 14, 2024) (final results of antidumping duty administrative review; 2022-2023), and accompanying Issues and Decision Memorandum (Nov. 6, 2024) ......... 28

*Steel Concrete Reinforcing Bar From the Republic of Türkiye*, 89 Fed. Reg. 66,350 (Dep't Commerce Aug. 15, 2025) (preliminary results and rescission, in part, of antidumping duty administrative review; 2022-2023) and accompanying Decision Memorandum (Aug. 5, 2024) .......... 29

*Aluminum Extrusions From the Republic of Türkiye*, 89 Fed. Reg. 80512 (Oct. 3, 2024) (final affirmative determination of sales at less than fair value), and accompanying Decision Memorandum" (Sept. 26, 2024) ...................................................................................................... 33–34

## OTHER AUTHORITIES

*Antidumping Methodologies: Market Economy Inputs, Expected Non-Market Economy Wages, Duty Drawback; and Request for Comments*, 71 Fed. Reg. 61,716, 61,723 (Dep't Commerce Jan. 9, 2007) (request for comments) ....................................................................................... 25

Final Results of Redetermination Pursuant to Court Remand in *Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*, Consol. Ct. No. 21-00246; Slip Op. 24-44 (CIT Apr. 11, 2024), Common Alloy Aluminum Sheet from the Republic of Türkiye (July 31, 2024) ................... 18, 19, 31

**Consol. Case No. 26-00722**                       NON-CONFIDENTIAL
                                                              VERSION

## MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT UPON THE AGENCY RECORD

Consolidated Plaintiffs, Yildiz Demir Çelik Sanayi A.Ş. ("YD") and

Yildiz Entegre AGAÇ Sanayi ve Ticarat A.Ş. ("YE") (collectively, "YDC"

or "Consolidated Plaintiffs"), hereby submit this Memorandum in

Support of their Motion for Judgment on the Agency Record in

accordance with Rule 56.2(c) of the Rules of this Court. For the reasons

set forth below, Consolidated Plaintiffs respectfully request that the

Court reverse the challenged determination of the U.S. Department of

Commerce ("Commerce"), and remand with instructions consistent with

this Memorandum and the Court's findings.

### STATEMENT PURSUANT TO RULE 56.2(C)

I.    Administrative Determination Under Review

This action is an appeal from Commerce's final determination in the

investigation of *Certain Corrosion-Resistant Steel Products From the

Republic of Türkiye*, 90 Fed. Reg. 42,216 (Dep't Commerce Aug. 29,

2025) (final affirmative determination of sales at less than fair value)

("*Final Determination*"), P.R. 364, and Memorandum to Abdelali

Elouaradia, Deputy Assistant Secretary for Enforcement and

Compliance, re: "Issues and Decision Memorandum for the Final

1

**Consol. Case No. 26-00722**                    **NON-CONFIDENTIAL**
                                                              **VERSION**

Affirmative Determination of Sales at Less Than Fair Value in the

Investigation of Certain Corrosion-Resistant Steel Products from the

Republic of Turkïye (Aug. 25, 2025), P.R. 354 ("Final Decision Memo")

and the Antidumping Duty Orders on Corrosion-Resistant Steel

Products from Australia, Brazil Canada, Mexico, the Netherlands,

South Africa, Taiwan, the Republic of Türkiye, the United Arab

Emirates, and the Socialist Republic of Vietnam.[1] *See Corrosion-*

*Resistant Steel Products From Australia Brazil, Canada Mexico, the*

*Netherlands, South Africa, Taiwan, the Republic of Türkiye, the United*

*Arab Emirates, and the Socialist Republic of Vietnam*, 90 Fed. Reg.

59,494 (antidumping duty orders).

## II.    Issues Presented

Plaintiffs seek judgment on the agency record with respect to the

following four issues:

---

[1]    Documents contained in the administrative record are identified by the name and date of the documents, followed by the public ("P.R.") and confidential ("C.R.") index numbers assigned to these documents in the respective administrative record indices that the U.S. Department of Commerce filed with the Court on February 25, 2026.  *See* Admin. Rec., ECF Nos. 34-3 and 34-4, Feb. 25, 2026.

1. Whether Commerce determination to calculate YDC's interest expense ("INTEX") ratio including a net monetary loss that was not recognized in YE's income statement, and where those monetary losses reflected long-term financing components, was supported by substantial evidence and otherwise in accordance with law.

2. Whether Commerce's determination not to calculate a sales-side duty drawback adjustment based on the same closed inward processing certificates ("IPC") it used to calculate a cost-side adjustment was supported by substantial evidence and otherwise in accordance with law.[2]

---

[2] After additional review of the administrative record, YDC has decided not to seek judicial review of Count Three of its February 17, 2026, Complaint, *see* Compl., ECF No. 8, Feb. 17, 2026, filed in *Yildiz Demir Çelik Sanayi A.Ş. and Yildiz Entegre AGAÇ Sanayi ve Ticaret A.Ş.*, Case No. 26-00724, and YDC therefore is no longer pursing these aspects of its appeal.

3

## III.    Standard of Review

The Court has jurisdiction pursuant to 28 U.S.C. § 1581(c). In reviewing final determinations in antidumping duty ("AD") administrative reviews, the Court holds as unlawful agency determinations that are not supported by substantial evidence on the record, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i).

Under Section 706 of the Administrative Procedures Act ("APA"), a reviewing Court will set aside any agency action that is inconsistent with the law. 5 U.S.C. § 706(2)(A). When applying this standard, the APA provides that "the reviewing court shall decide all relevant questions of law {and} interpret constitutional and statutory provisions." *Id.* Courts, not agencies, decide "all relevant questions of law" arising on review of agency action." *Id.*; *see also Loper Bright Enterprises v. Raimondo*, 144 S.Ct. 2244, 2273 (2024) (holding that "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires . . . . {C}ourts need not and under the APA may not defer to an

4

agency interpretation of the law simply because a statute is ambiguous").

The Court "will not allow an agency, under the guise of lawful discretion, to contravene or ignore the intent of the legislature or the guiding purpose of the statute." *Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 405, 636 F. Supp. 961, 966 (1986), *aff'd*, 810 F.2d 1137 (Fed. Cir. 1987). An agency acts contrary to law if its decision making is arbitrary or unreasoned. *See Burlington Truck Lines v. United States*, 371 U.S. 156, 167–68 (1962). The agency must establish and articulate a "rational connection between the facts found and the choice{s} made." *Id.*, at 168; *see also Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013). Moreover, "{a}gency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently." *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001).

The Court has found Commerce's determinations unsupported by substantial evidence "where Commerce has relied on inadequate facts or reasoning, or failed to provide an adequate basis for its conclusions." *Rhone-Poulenc, Inc. United States*, 20 CIT 573, 575, 927 F. Supp. 451,

5

454 (1996); *see also Asociacion Colombiana de Exportadores de Flores v. United States*, 2 CIT 173, 184, 6 F. Supp. 2d 865, 880 (1998) (stating that a change in practice requires Commerce to explain the basis for its change and that such basis must be in accordance with law and supported by substantial evidence).

Substantial evidence is "more than a mere scintilla," and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 619-20 (1966) (*quoting Consolidated Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938)), *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009). In order for a determination to satisfy this standard, "{t}here must be a rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962); *Nucor Corp. v. United States*, 32 CIT 1380, 594 F. Supp. 2d 1320, 1331-32 (2008). Additionally, "{t}he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).

Case 1:26-cv-00722-JCG    Document 51-2    Filed 07/10/26    Page 14 of 66

Consol. Case No. 26-00722                              NON-CONFIDENTIAL
                                                                     VERSION

IV.    Statement of Facts

On October 2, 2024, Commerce published the notice that it had initiated an AD investigation into whether imports of corrosion-resistant steel products ("CORE") from Türkiye, among other countries, were being sold in the United States for less than fair value ("LTFV") for the period July 1, 2023 through June 30, 2024.  *See Certain Corrosion-Resistant Steel Products From Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, the Republic of Türkiye, the United Arab Emirates, and the Socialist Republic of Vietnam*, 89 Fed. Reg. 80,195 (Dep't Commerce Oct. 2, 2024) (initiation of less-than-fair value investigations), P.R. 53.

On October 23, 2024, Commerce selected YDÇ and Borçelik Çelik Sanayii Ticaret A.Ş. as mandatory respondents. *See* Memorandum to Scot Fullerton, Acting Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations re: "Respondent Selection" (Oct. 23, 2024), P.R. 89.

On December 13, 2024, YDC submitted its Section C questionnaire in which it identified that two of the Inward Processing Certificates ("IPC") for under which it calculated per-unit duty drawback for

claimed imports of subject merchandise to the United States during the POI had not yet closed and one was awaiting administrative closure by the Government of the Republic of Türkiye ("GOT"). *See* Letter from Trade Resources Company, re: "Section C Questionnaire Response" (Dec. 13, 2024), C.R. 46–73, at 36, Ex. C-17. YDC further stated that it would provide closure documentation as soon as closure is completed and such documentation is provided by the GOT. *Id.* at 36.

On March 10, 2024, Commerce issued a supplemental questionnaire to YDC in which it requested that YDC update the duty drawback field of its U.S. sales database to reflect any additional IPC closures since the time it submitted its Section C questionnaire response. *See* Letter to Yildiz Demir Çelik Sanayi A.S., re: "YDÇ Section C Supplemental Questionnaire" (Mar. 10, 2025), C.R. 191, at Attach. at 3 (question no. 12). In response, on March 24, 2024, YDC demonstrated that three IPCs were closed by the GOT and linked those IPCs to realized exportations to closed IPCs. *See* Letter from Trade Resources Company, re: "Section C Supplemental Questionnaire Response" (Mar. 24, 2025), C.R. 215–231, at Exs. S4-23, S4-24 ("YDC Supp. C QR"). Commerce did not issue any supplemental questionnaire to YDC raising any questions with

Case 1:26-cv-00722-JCG    Document 51-2    Filed 07/10/26    Page 16 of 66

Consol. Case No. 26-00722                    NON-CONFIDENTIAL
                                                      VERSION

YDC's duty drawback calculations or questioning the linkage of those adjustments to U.S. sales contained in YDC's submitted U.S. sales database.

On March 3, 2025, Commerce issued a supplemental Section D questionnaire to YDC in which it requested that YDC revise its interest expense ("INTEX") ratio calculation to include a monetary loss or explain why YDC believes it is appropriate to exclude the monetary loss. See Letter to YDC and YE, re: "1st Section D Supplemental Questionnaire" (Mar. 3, 2025), C.R. 173, at Attach. at 9 (question no. 18.c). In response, YDC explained that it was appropriate to exclude the monetary loss in the INTEX ratio calculation because most items included in the monetary loss relate to long-term fixed assets, capital and prepaid expenses. Letter from Trade Resources Company, re: "Section D Supplemental Questionnaire Response" (Mar. 24, 2025), C.R. 282–301, at S3-38 to S3-39 ("YDC Supp. D QR"). In other words, YDC stated that none of the items included in the monetary loss were relevant to short-term financing expenses captured in the INTEX ratio calculation. *Id.*

Case 1:26-cv-00722-JCG   Document 51-2   Filed 07/10/26   Page 17 of 66

Consol. Case No. 26-00722                        NON-CONFIDENTIAL
                                                          VERSION

In addition, YDC argued that including the monetary loss from the INTEX ratio calculation double-counted those losses because they are already captured in YDC's costs of production. *Id.* at S3-38. YDC highlighted that including these losses in INTEX was improper since the monetary loss relates to restatement of differences of all accounts recorded by YDC in assets, liabilities, and profits and loss. *Id.* at S3-38. YDC explained that Commerce's high inflation margin program already indexed to inflation. *Id.*

On April 10, 2025, Commerce published its preliminary affirmative determination of sales at less than fair value. *See Certain Corrosion-Resistant Steel Products From the Republic of Türkiye*, 90 Fed. Reg. 15,340 (Dep't Commerce Apr. 10, 2025) (preliminary affirmative determination of sales at less than fair value, postponement of final determination, and extension of provisional measures), P.R. 243 ("*Prelim. Results*"), and accompanying Decision Memorandum to Christopher Abbott, Deputy Assistant Secretary for Policy and Negotiations, performing the non-excusive functions and duties of the Assistant Secretary for Enforcement and Compliance, re: "Decision Memorandum for the Preliminary Affirmative Determination of Sales

10

Case 1:26-cv-00722-JCG    Document 51-2    Filed 07/10/26    Page 18 of 66

Consol. Case No. 26-00722                          NON-CONFIDENTIAL
                                                            VERSION

at Less Than Fair Value in the Investigation of Certain Corrosion-Resistant Steel Products from the Republic of Türkiye" (Apr. 3, 2025), P.R. 228 ("Prelim. Decision Memo"). Commerce calculated a preliminary weighted-average antidumping duty ("AD") margin of 15.18 percent. *Prelim. Results*, 90 Fed. Reg. at 15,342.

In the preliminary determination, Commerce made no duty drawback adjustment to YDC's U.S. price because it preliminarily found that YDC had not provided documentation that the IPCs tied to its U.S. imports of subject merchandise were closed during the POI. Prelim. Decision Memo at 13, P.R. 228. Commerce also revised YDC's reported financial expense ("INTEX") ratio to include net monetary loss recognized on the consolidated financial statements of its parent company, YE, which increased YDC's INTEX ratio from [ ] percent to [ ] percent. *See* Memorandum to Heidi K. Schriefer, Supervisory Accountant, re: "Cost of Production and Constructive Value Calculation Adjustments for the Preliminary Determination – Yildiz Demir Celik Sanayi A.S. and Yildiz Entegre Agac Sanayi ve Ticaret A.S." (Apr. 3, 2025), C.R. 329, at 2, Attach. 2.

Case 1:26-cv-00722-JCG    Document 51-2    Filed 07/10/26    Page 19 of 66

Consol. Case No. 26-00722                          NON-CONFIDENTIAL
                                                           VERSION

From May 13 through May 16, 2025, Commerce verified the cost responses of YDC. *See* Memorandum to The File, re: "Verification of the Cost Response of Yildiz Demir Çelik Sanayi A.Ş. and Yildiz Entegre AGAÇ Sanayi ve Ticarat A.Ş in the Antidumping Duty Investigation of Certain Corrosion-Resistant Steel Products from the Republic of Türkiye" (July 9, 2025), C.R. 540, at 1. On July 9, 2025, Commerce issued verification report from the verification of YDC's cost responses. *See id.* In its verification report, Commerce found that YDC provided a schedule detailing the items included in the monetary loss in the consolidated financial statements of YE. *Id.* at 2. Commerce recognized that the schedule provided by YDC showed that the total monetary loss included a significant value from accounts that were unrelated to financial income or expenses. *Id.* at 14. Commerce acknowledged it would need to determine in the final determination whether it is appropriate to include the net monetary loss in the calculation of YDC's INTEX ratio. *Id.* at 2.

On July 17, 2025, YDC filed a case brief on cost-related issues in which it argued that Commerce should not have included the monetary loss in the INTEX ratio calculation. *See* Letter from Trade Resources

12

NON-CONFIDENTIAL
                                                        VERSION

Company, re: "YDC's Case Brief for Cost Issues" (July 17, 2025), C.R.

574, at 9–14 ("YDC Cost Case Br."). First, YDC argued that the most

items of the monetary loss relate to long-term fixed assets, capital, and

prepaid expenses, none of which are relevant to short-term financing

calculations. *Id.* at 10. YDC also argued that Commerce's high inflation

program would double-count the monetary gain since it indexed each

monthly cost component to capture the effects of high inflation. *Id.* at

10-11.

Second, YDC explained in its case brief that including monetary loss

is inconsistent with Commerce's practice of relying on a respondent's

normal books and records so long as they are prepared in accordance

with generally accepted accounting principles ("GAAP") because YDC's

accounting statements did not include the monetary adjustment

included by Commerce. *Id.* at 11.

Third, YDC argued in its case brief that Commerce improperly

included the monetary loss in YDC's INTEX ratio because the loss

reflects a non-POI expense that includes the impact of prior years. *Id.*

at 13.

Case 1:26-cv-00722-JCG    Document 51-2    Filed 07/10/26    Page 21 of 66

Consol. Case No. 26-00722                          NON-CONFIDENTIAL
                                                              VERSION

On July 22, 2025, YDC filed a case brief on sales-related issues. See

Letter from Trade Resources Company, re: "YDC's Case Brief for Sales

Issues Except Arguments Related to Differential Pricing" (July 22,

2025), C.R. 577 ("YDC Sales Case Br."). YDC argued in its case brief

that the record shows that all three of YDC's IPCs were closed, and that

it submitted correspondence from the Government of Türkiye ("GOT")

demonstrating that all had been officially validated. *Id.* at 11 (*citing*

YDC Supp. C QR at Ex. S4-24). YDC argued that Commerce's practice

had been to consistently accept such evidence to demonstrate IPC

closure for purposes of granting a duty drawback adjustment. *Id.* YDC

urged Commerce to reconsider its preliminary determination not to

grant it a duty drawback adjustment because the Federal Circuit had

held that a duty drawback adjustment "requires an adjustment to

'export price' based on the full extent of the duty drawback." *Id.* at 14.

On August 29, 2025, Commerce Published the *Final Determination.*

*See Final Determination*, 90 Fed. Reg. at 42,216. Commerce continued

to include the net monetary loss in its calculation of YDC's INTEX ratio.

Final Decision Memo at 25.  Commerce concluded it was appropriate to

account for the impact of inflation because it conflated YDC's

14

Case 1:26-cv-00722-JCG    Document 51-2    Filed 07/10/26    Page 22 of 66

Consol. Case No. 26-00722                    NON-CONFIDENTIAL
                                                     VERSION

application of Turkish Generally Accepted Accounting Principles

("GAAP") with Turkish Financial Reporting Standards ("TFRS"). *Id.* As

a result, Commerce continued include YE's net monetary loss in YDC's

INTEX ratio. *Id.* Commerce also found that including the net monetary

loss would not double-count inflation in YDC's reported costs because

Commerce found that its cost methodology did not increase costs for

inflation, but rather used indexing to calculate annual weighted-

average costs in a constant currency. *Id.* at 26. Lastly, Commerce

concluded that the monetary loss was a POI loss because the

adjustment represented the current year gain or loss due to inflation on

monetary assets while also acknowledging that the loss compares to the

prior year's financial statements, which include losses applicable to the

prior year. *Id.* at 27.

Commerce also continued to deny YDC a duty drawback adjustment

because it found that YDC had not demonstrated that any of its IPCs

closed during the POI. *Id.* at 41. Commerce further claimed that its

practice generally limits consideration of duty drawback adjustments to

IPCs that closed during the POI. *Id.* Therefore, Commerce continued to

limit its duty drawback adjustment to IPCs closed during the POI based

15

on the rationale that no benefit accrued to YDC under an IPC until the IPC is closed. *Id.* Commerce concluded that limiting duty drawback to the actual duty liability extinguished during the POI is consistent with its general practice of collecting allocated expense data covering the POI for sales adjustment purposes. *Id.* at 43.

Based on these determinations, Commerce calculated a final weighted-average AD rate for YDC of 10.49 percent. *See Final Determination*, 90 Fed. Reg. at 42,217. On December 19, 2025, Commerce published the *AD Order*. *See Corrosion-Resistant Steel Products From Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, the Republic of Türkiye, and the Socialist Republic of Vietnam:  Antidumping Duty Orders*, 90 Fed. Reg. 59,494 (Dec. 19, 2025) ("*AD Order*").

This appeal followed.

NON-CONFIDENTIAL VERSION

## SUMMARY OF ARGUMENT

YDC summarizes the arguments below on the following two issues raised in this memorandum of law:

A.    Commerce Unlawfully Denied YDC a Duty Drawback Adjustment on IPCs it Demonstrated Were Closed and Whose Closure it Linked to POI Exports

Commerce unlawfully denied YDC a duty drawback adjustment related to the three IPCs YDC demonstrated were closed and for which YDC reconciled to exportations made during the POI. *See* Final Decision Memo at 40, 41, P.R. 354. Commerce unlawfully imposed a limitation in this case not found in the statute by requiring that IPCs be closed within the same time period of the POI even though closing during the POI is totally unrelated to whether YDC could add import information or whether YDC could demonstrate that the same closed IPCs were linked to exports during the POI. *See* Final Decision Memo at 41–42.

Commerce's application of rigid POI time limit restricting duty drawback adjustments to IPCs closed during the POI is inconsistent with § 1677a(c)(1)(B), which lacks any temporal requirement that duties be exempted or rebated at a specific moment in time. In fact, the statute requires the adjustment of export price whether the import

17

duties were exempted upon importation or rebated thereafter. *See* 19 U.S.C. § 1677a(c)(1)(B). The statute allows for temporal flexibility in when liability for import duties can be extinguished. *See id.*

The primary focus of demonstrating entitlement to a duty drawback is establishing a link between the non-collection or rebate of duties and exportation to the United States and then linking the amount of the exemption to that exportation. *Id.* (requiring an increase to export price "by the amount of import duties imposed" exempted or rebated "by *reason of the exportation* of the subject merchandise to the United States"). Commerce's interpretation is, therefore, contradicted by the temporal flexibility expressed in the statute.

Likewise, Commerce's practice is also unrelated to the requirement that a respondent to demonstrate that the import duty paid and non-payment or rebate of that duty is directly linked to, and dependent, on each other. Commerce's practice until this case had generally been to accept evidence of closure presented at various time in a proceeding, even where that IPC closure occurred outside the POI. *See, e.g.*, Final Results of Redetermination Pursuant to Court Remand in *Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*, Consol. Ct. No. 21-

Case 1:26-cv-00722-JCG    Document 51-2    Filed 07/10/26    Page 26 of 66

Consol. Case No. 26-00722                                    NON-CONFIDENTIAL
                                                                        VERSION

00246; Slip Op. 24-44 (CIT Apr. 11, 2024). The rigid test applied in this investigation is not supported by Commerce's past practice, and Commerce's past more flexible approach mirrors the flexibility reflected in the statutory language.

Commerce has also arbitrarily and inconsistently defined whether and when it will consider proof of IPC closure after the end of the POI over many proceedings. Commerce did not even acknowledge a change in its practice much less explain why such a change in practice was necessary or reasonable. *Asociacion Colombiana de Exportadores de Flores v. United States*, 2 CIT 173, 184, 6 F. Supp. 2d 865, 880 (1998) (stating that a change in practice requires Commerce to explain the basis for its change and that such basis must be in accordance with law and supported by substantial evidence). Therefore, the Court should conclude that Commerce's POI limitation is unreasonable and arbitrary and runs contrary to the flexible language in the statute.

YDC demonstrated that three IPCs were closed by the GOT and linked those IPCs to realized exportations to closed IPCs. *See* Letter from Trade Resources Company, re: "Section C Supplemental Questionnaire Response" (Mar. 24, 2025), C.R. 215–231, at Exs. S4-23

("YDC Supp. C QR") (containing YDC's list of realized exportations under closed IPCs and calculating the duty drawback adjustment and per-unit sales-side adjustments linked to U.S sales imported under the closed IPCs), S4-24 (containing correspondence from the GOT confirming that all IPCs had been validated and closed).

Commerce offers no reasoned analysis for why IPC closure during the POI is necessary to conclude that import duties were not collected by reason of exportation of the subject merchandise to the United States. In fact, the identical justifications for the POI closure limitation articulated by Commerce were previously rejected by the Court as unreasonable and arbitrary. *See Tosçelik Profil ve Sac Endüstrasi A.Ş. v. United States*, 348 F.Supp.3d 1321, 1326 (Ct. Intl. Trade 2018) (holding that "Commerce's imposition of a POI limitation unreasonably undercuts its stated goals of accuracy, transparency, and predictability"). None of Commerce's justifications withstand scrutiny, and all those reasons were raised and rejected by the Court in *Tosçelik*.

For all these reasons, Commerce's imposition of the POI limitation on IPC closure is unreasonable, arbitrary, and unlawful. Commerce's rule is not reasonably tied to the inquiry required by the statute (i.e.,

20

Case 1:26-cv-00722-JCG    Document 51-2    Filed 07/10/26    Page 28 of 66

Consol. Case No. 26-00722                    NON-CONFIDENTIAL
                                                        VERSION

linking imported duty exemptions to imported subject merchandise) or to any of the predictability, administrability, or transparency concerns identified by Commerce. The Court should direct Commerce to grant YDC a duty drawback adjustment based on the IPCs it demonstrated were closed.

B.    Commerce Unlawfully Denied CS Wind an Entered Value
      Adjustment

Commerce unlawfully included the net monetary loss of YE in its calculation of YDC's INTEX ratio. Final Decision Memo at 25, P.R. 354. The monetary loss reflects an adjustment of the historical figures in the statutory books and records to current inflation adjusted level. *See* Section D Supplemental Questionnaire Response, at page S3-38 to S3-39, Exhibit S3-26 (Revised Ex D21), (Mar. 24, 2025), C.R. 282, 290, and 301, P.R. 218. Therefore, the monetary gain/loss includes the impact of prior years in addition to the current fiscal year. Commerce's questionnaire specifically instructs only period expenses should be included in the reported cost of production. *See* High Inflation Section D Questionnaire, at page D-21, P.R. 108 (Nov. 15, 2024). Therefore, the non-period, non-financial expenses cannot be considered as period

21

financial expenses and should have been excluded from Commerce'

INTEX ratio calculation.

In *Salmon from Chile*, Commerce explained that "we have included

only the amount related to *current* monetary assets and monetary

liabilities." *See Notice of Final Results of Antidumping Duty*

*Administrative Review: Fresh Atlantic Salmon from Chile*, 65 Fed. Reg.

87472, (Dec. 15, 2000) and accompanying Issues and Decision

Memorandum, Comment 1, (Barcode 4778946-01) (emphasis added),

*citing Notice of Final Determination of Sales at Less Than Fair Value:*

*Emulsion Styrene-Butadiene Rubber From Mexico,* 64 Fed. Reg. 14872,

14882 (Mar. 29, 1999) ("*ESBR from Mexico*").

Had Commerce followed its practice to include only current monetary

and financial assets and liabilities in its calculation of interest expense,

Commerce would have excluded nearly all the net monetary loss booked

in the statutory financial statements of YDC's parent company.

Commerce's determination to include non-current expenses in the

INTEX ratio conflicts with Commerce's practice in *Salmon from Chile*

and *ESBR from Mexico*. Accordingly, Commerce's interest expense

calculation must be revised as not in accordance with law and otherwise

NON-CONFIDENTIAL
VERSION

not supported by substantial evidence and should be limited only to the items identified by the outside auditor as relating to financial income or expense.

## ARGUMENT

I.  Commerce Unlawfully Declined to Grant YDC a Duty Drawback Adjustment for Imports Subject to Closed Inward Processing Certificates

Commerce unlawfully denied YDC a duty drawback adjustment related to the three IPCs YDC demonstrated were closed and for which YDC reconciled to exportations made during the POI. *See* Final Decision Memo at 40, 41, P.R. 354 (denying YDC a duty drawback because Commerce found that none of the IPCs submitted by YDC closed during the POI). Commerce's imposition of a time limitation requiring that IPCs close during the POI—rather than merely requiring closed IPCs to be linked to POI exports—unlawfully failed to increase YDC's export price by the amount of duty drawback it received from the GOT. Commerce's determination to deny YDC a duty drawback adjustment for closed IPC is also arbitrary and unreasonable because Commerce failed to follow its established practice of granting a duty drawback adjustment for all closed IPCs. For these reasons, the Court

should require Commerce to grant YDC a duty drawback adjustment

for all YDC's IPCs for which it provided proof of closure and that YDC

tied to exports of subject merchandise during the POI.

A. Legal Standard

The statute requires that Commerce increase a respondent's export

price by "the amount of any import duties imposed by the country of

exportation which have been rebated, or which have not been collected,

by reason of the exportation of the subject merchandise to the United

States." 19 U.S.C. § 1677a(c)(1)(B). The statute also requires an

adjustment to "'export price' based on the full extent of duty drawback."

*Uttam Galva Steels Ltd. v. United States*, 977 F.3d 1192, 1198 (Fed. Cir.

2021).

Commerce acknowledged that it applies a two-pronged test for

granting duty drawback adjustments:

> (1) the import duty paid and the rebate payment are directly
> linked to, and dependent upon, one another (or the exemption
> from import duties is linked to exportation); and (2) there are
> sufficient imports of the imported raw material to account for the
> drawback received upon the exports of the manufactured product.

Final Decision Memo at 40–41 (*citing Saha Thai Steel Pipe (Public)*

*Company Ltd. v. United States*, 635 F.3d 1335, 1340–41 (Fed. Cir.

2011), *Thai Steel Pipe (Public) Company Ltd. v. United States*, 635 F.3d

NON-CONFIDENTIAL
                                                                        VERSION

1335, 1340–41 (Fed. Cir. 2011), *Antidumping Methodologies: Market Economy Inputs, Expected Non-Market Economy Wages, Duty Drawback; and Request for Comments*, 71 Fed. Reg. 61,716, 61,723 (Dep't Commerce Jan. 9, 2007) (request for comments)).

Commerce also acknowledged that its practice regarding the Turkish Inward Processing Regime ("IPR") is to grant a duty drawback adjustment for "closed IPCs (*i.e.*, import certificates which the company *was no longer permitted by the government of Türkiye to add import information*)". Final Decision Memo at 41 (emphasis in original). Commerce explained that it considers Turkish companies liable for the amount of duties foregone until satisfying the export requirements under an IPC. *Id.* In other words, Commerce's practice reflects its determination that, even though an importer who holds an open IPC may not pay duties on imported goods, it may nevertheless be liable until the IPC is closed, at which point the potential duty liability for the importer is extinguished. *See id.*

Case 1:26-cv-00722-JCG    Document 51-2    Filed 07/10/26    Page 33 of 66

Consol. Case No. 26-00722                                    NON-CONFIDENTIAL
                                                                        VERSION

B. The Statute Requires a Duty Drawback Adjustment to U.S. Price
   for All IPCs YDC Demonstrated Were Closed and Linked to
   Reported Exports of Subject Merchandise

Commerce unlawfully imposed a limitation in this case not found in

the statute by requiring that IPCs be closed within the same time

period of the POI even though closing during the POI is totally

unrelated to whether YDC could add import information or whether

YDC could demonstrate that the same closed IPCs were linked to

exports during the POI. *See* Final Decision Memo at 41–42 (denying

YDC's duty drawback in its entirety because Commerce found that none

of YDC's IPCs used in its duty drawback claim were officially approved

during the POI and limiting valid claims to duty drawback to IPCs for

which the GOT "officially closed during the POI").

Commerce wrongly claims that limiting duty drawback adjustments

to IPCs closed during the POI is consistent with § 1677a(c)(1)(B). *See*

Final Decision Memo at 41. The plain language of the statute clearly

lacks any temporal requirement that duties be exempted or rebated at a

specific moment in time. In fact, the statute requires the adjustment of

export price whether the import duties were exempted upon

importation or rebated thereafter. *See* 19 U.S.C. § 1677a(c)(1)(B). This

language demonstrates that the statute allows for temporal flexibility in when liability for import duties can be extinguished. *See* 19 U.S.C. § 1677a(c)(1)(B).

Moreover, the statutory language shows that the primary focus of demonstrating entitlement to a duty drawback is establishing a link between the non-collection or rebate of duties and exportation to the United States and then linking the amount of the exemption to that exportation. *Id.* (requiring an increase to export price "by the amount of import duties imposed" exempted or rebated "by *reason of the exportation* of the subject merchandise to the United States"). Commerce's interpretation is therefore contradicted by the temporal flexibility expressed in the statute, particularly where it is unquestioned that YDC's closed IPCs extinguished any duty liability related to exportations of subject merchandise made under those closed IPCs and YDC linked those exportations of subject merchandise to the same closed IPCs. The statute requires import duties that are rebated, which is a concept so flexible that it can occur shortly after importation or even years later as in the IPR, so long as they are linked to exports of subject merchandise.  Therefore, Commerce's idea that there is a rigid

temporal limitation on IPC closure during the POI is incompatible with the best reading of the statute. *See Loper Bright Enterprises v. Raimondo*, 144 S.Ct. at 2273.

### C. Commerce's Practice Does Not Reflect the Period of Investigation Closure Limitation Applied in this Investigation

The strict temporal limitation on IPC closure imposed by Commerce in this investigation is also untethered to the second prong of Commerce's practice, which requires a respondent to demonstrate that the import duty paid, and non-payment or rebate of that duty is directly linked to, and dependent, on each other. Commerce's added restrictive temporal limitation is totally at odds with the statutory requirement that Commerce adjust a respondent's export price based on the full extent of duty drawback, *see* 19 U.S.C. § 1677a(c)(1)(B), *Uttam Galva*, 977 F.3d at 1198, and Commerce's own practice.

YDC does not contest that Commerce's practice consistently grants limits duty drawback adjustments to cases where a respondent demonstrates that IPCs were closed. *See, e.g., Common Alloy Aluminum Sheet From the Republic of Türkiye*, 89 Fed. Reg. 89,965 (Dep't Commerce Nov. 14, 2024) (final results of antidumping duty administrative review; 2022-2023), and accompanying Issues and

**NON-CONFIDENTIAL**
**VERSION**

Decision Memorandum for the Final Results of the Administrative

Review of the Antidumping duty Order on Common Alloy Aluminum

Sheet from the Republic of Türkiye; 2022-2023 (Nov. 6, 2024), at 6

(relying only on closed IPCs in determining the amount of duty

drawback) ("CAAS from Turkey 22-23 AR IDM"), *Certain Aluminum*

*Foil From the Republic of Türkiye*, 90 Fed. Reg. 21,896 (Dept Commerce

May 22, 2025) (final results of antidumping duty administrative review;

2022-2023), and accompanying Issues and Decision Memorandum for

the Final Results of the Antidumping Duty Administrative Review:

Certain Aluminum Foil from the Republic of Türkiye; 2022-2023 (May

16, 2026), at 11 (considering only closed IPCs that include exports of in-

scope merchandise to the United States because Commerce found that

the respondent realizes the benefit of exempted duties only when the

IPC is closed), *Steel Concrete Reinforcing Bar From the Republic of*

*Türkiye*, 89 Fed. Reg. 66,350 (Dep't Commerce Aug. 15, 2025)

(preliminary results and rescission, in part, of antidumping duty

administrative review; 2022-2023) and accompanying Decision

Memorandum for the Preliminary results of the Antidumping Duty

Administrative Review of Steel Concrete Reinforcing Bar from the

29

Republic of Türkiye; 2022-2023 (Aug. 5, 2024), at 11 (stating that

Commerce's practice is to consider only closed IPCs that include exports

of in-scope merchandise to the United States to determine the amount

of duty drawback) (unchanged in *Steel Concrete Reinforcing Bar From

the Republic of Türkiye*, 90 Fed. Reg. 21,275 (Dep't Commerce May 19,

2025) (final results of antidumping duty administrative review; 2022-

2023), and accompanying Issues and Decision Memorandum for the

Final Results of the Antidumping Duty Review of the Antidumping

Duty Order of Steel Concrete Reinforcing Bar from the Republic of

Türkiye; 2022-2023 (May 12, 2025)).

Likewise, the Court has repeatedly affirmed that open IPCs are not

eligible for a duty drawback adjustment. *See, e.g.*, *Assan Aluminyum

Sanayi ve Ticaret A.S. v. United States*, 48 CIT __, 701 F.Supp.3d 1321,

1328 (2024) (holding there was "no clear statutory basis" to apply a duty

drawback adjustment to "certain open-IPC sales"); *Habas Sinai ve Tibbi

Gazlar Istihsal Endüstrisi, A.Ş. v. United States*, 44 CIT __, __, 439

F.Supp.3d 1342, 1349 (2020) (holding that "Commerce was within its

discretion to decline to {calculate a duty draw back adjustment for}

duties conditionally exempted under open IPCs).

30

NON-CONFIDENTIAL
                                                                    VERSION

Nevertheless, Commerce's practice until this case had generally been

to accept evidence of closure presented at various time in a proceeding,

even where that IPC closure occurred outside the POI. *See*, *e.g.*, Final

Results of Redetermination Pursuant to Court Remand in *Assan*

*Aluminyum Sanayi ve Ticaret A.S. v. United States*, Consol. Ct. No. 21-

00246; Slip Op. 24-44 (CIT Apr. 11, 2024), Common Alloy Aluminum

Sheet from the Republic of Türkiye (July 31, 2024), at 8, *available at*:

https://accessmodernizationprod.blob.core.windows.net/temp-

downloads/7434c60c-68f5-48a9-af7f-a8c3d5e75d88/4607225-

01.pdf?skoid=a58dbe30-359b-4b8f-bd04-f129add7e938&sktid=a1d183f2-

6c7b-4d9a-b994-5f2f31b3f780&skt=2026-06-

28T20%3A04%3A57Z&ske=2026-06-

28T20%3A14%3A57Z&sks=b&skv=2026-02-06&sv=2026-02-

06&se=2026-06-

28T20%3A14%3A57Z&sr=b&sp=r&rscd=inline%3B+filename%3D%224

607225-

01.pdf%22&rsct=application%2Fpdf&sig=UsnpnaGCPGNkIY%2Begyjz

U4zBmv16PIDf26S72CvQlfA%3D (in which Commerce stated that it

used IPCs that were closed outside the POI for purposes of calculating

the duty drawback adjustments "when sufficient evidence exists on the record to demonstrate their closure") (*sustained by Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*, 44 CIT __, __, 789 F.Supp.3d 1257, 1267–68 (2025) (sustaining Commerce's determination to treat information of IPC closure after the POI in response to a supplemental questionnaire in a remand segment of the proceeding as timely submitted and concluding that gathering evidence of IPC closure is relevant to correcting an erroneous duty drawback adjustment)). In fact, Commerce requested a voluntary remand in a recent case in which Commerce stated it denied a duty drawback adjustment related to an IPC closure presented in a respondent's supplemental questionnaire that it *mistakenly* believed the record lacked evidence to demonstrate had been closed. *See Habas Sinai ve Tibbi Gazlar Istihsal Endüstrisi, A.Ş. v. United States*, 439 F.Supp.3d 1342, 1347–48 (in which Commerce requested, and the Court granted, voluntary remand to allow Commerce to include closed IPCs mistakenly omitted from the duty drawback calculation where the record contained evidence demonstrating an IPC had been closed after the POI, but prior to verification). Commerce's past more flexible approach mirrors the

32

flexibility reflected in the statutory language. The rigid test applied in this investigation is, therefore, also not supported by Commerce's past practice.

Where Commerce attempted to impose a similar POI limitation on closure, the Court found imposing such a requirement to be unreasonably applied to exclude closed IPCs that Commerce had verified. *Tosçelik Profil ve Sac Endüstrasi A.Ş. v. United States*, 348 F.Supp.3d at 1326 (rejecting Commerce's rationale that an IPC be closed during the POI as having "always been a result in search of a rationale" and that "Commerce failed to identify a reasonable explanation supported by the record"). As discussed in greater detail below, Commerce adopted a materially identical approach to that rejected by the Court in *Tosçelik* in this investigation.

Commerce has also arbitrarily and inconsistently defined whether and when it will consider proof of IPC closure after the end of the POI over many proceedings. *See, e.g., Aluminum Extrusions From the Republic of Türkiye*, 89 Fed. Reg. 80512 (Oct. 3, 2024) (final affirmative determination of sales at less than fair value), and accompanying Memorandum to Abdelali Elouaradia, Deputy Assistant Secretary for

33

Enforcement and Compliance, re: "Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair Value Investigation of Aluminum Extrusions from the Republic of Türkiye" (Sept. 26, 2024), at 11 (agreeing that an adjustment "should be made to all sales pursuant to all IPCs which {respondent} has demonstrated on the record have been closed and the liability extinguished" whether the IPC closed prior, during, or after the POI), *Assan Aluminyum*, 789 F.Supp.3d at 1267–68 (sustaining Commerce's determination to treat information of IPC closure after the POI in response to a supplemental questionnaire in the remand segment of the proceeding as timely submitted and concluding that gathering evidence of IPC closure is relevant to correcting an erroneous duty drawback adjustment). Recognizing the shifting and arbitrary changes in Commerce's practice in this area, the Court has recognized that Commerce's general practice has merely been to "require some indication from the GOT that the IPC was approved" rather than strictly applied a specific temporal limitation on IPC closure. *See e.g., Icdas Celik Enerji Tersanev e Ulasim Sanayi A.S. v. United States*, 654 F.Supp.3d 1311, 1321 (Ct. Intl. Trade 2023) (noting that Commerce's practice has changed in recent years, but its current

34

practice requires some indication that from the GOT that the IPC was approved, not merely that an application for closure has been filed).

Commerce did not even acknowledge a change in its practice much less explain why such a change in practice was necessary or reasonable. *Asociacion Colombiana de Exportadores de Flores v. United States*, 2 CIT 173, 184, 6 F. Supp. 2d 865, 880 (1998) (stating that a change in practice requires Commerce to explain the basis for its change and that such basis must be in accordance with law and supported by substantial evidence). Therefore, the Court should conclude that Commerce's POI limitation is unreasonable and arbitrary and runs contrary to the flexible language in the statute.

D. Commerce's Denial of the Duty Drawback Adjustment for Closed IPCs Based on its Period of Investigation Time Limitation is Unreasonable, Arbitrary, and Capricious

Commerce first notified YDC of its determination to impose a limitation that IPCs must have closed within the same time period as the POI in its preliminary determination. In that decision, Commerce first denied YDC a duty drawback adjustment for closed IPCs because it concluded that none of YDC's IPCs actually closed during the POI. *See* Prelim. Decision Memo, P.R. 228, at 13. Commerce also did not question

Case 1:26-cv-00722-JCG    Document 51-2    Filed 07/10/26    Page 43 of 66

Consol. Case No. 26-00722                           NON-CONFIDENTIAL
                                                              VERSION

either in its preliminary determination, or in its final determination,

either that: (1) YDC had demonstrated that its IPCs were actually

closed; or (2) that it linked the duty drawback calculated in Exhibit S4-

23 to exportations of subject merchandise exported during the POI. *See*

*id.* at 13 (justifying denying YDC a duty drawback adjustment because

none of YDC's IPCs was closed during the POI), Final Decision Memo at

41 (limiting Commerce's analysis to only POI-closed IPCs and

concluding that YDC's IPCs were not closed during the POI).

YDC demonstrated that three IPCs were closed by the GOT and

linked those IPCs to realized exportations to closed IPCs. *See* Letter

from Trade Resources Company, re: "Section C Supplemental

Questionnaire Response" (Mar. 24, 2025), C.R. 215–231, at Exs. S4-23

("YDC Supp. C QR") (containing YDC's list of realized exportations

under closed IPCs and calculating the duty drawback adjustment and

per-unit sales-side adjustments linked to U.S sales imported under the

closed IPCs), S4-24 (containing correspondence from the GOT

confirming that all IPCs had been validated and closed). Commerce did

not issue any supplemental questionnaire to YDC raising any questions

with YDC's duty drawback calculations or questioning the linkage of

those adjustments to U.S. sales contained in YDC's submitted U.S. sales database.

Commerce claims that it is not sufficient that YDC not incur import duties linked to subject exports to the United States, or even that a respondent demonstrate that any contingent liability under an IPC closed after the POI have been extinguished as of the time Commerce completes its investigation. *See* Final Decision Memo at 42–43. Commerce's determination in this case requires that—not only must a respondent demonstrate that import duties were not collected (i.e., exempted in the language of the statute) and that the liability was extinguished by closure—but also that any contingent liability actually be extinguished within the POI. *See id.* (finding it inappropriate to grant a duty drawback adjustment to respondents that did not accrue a benefit before the end of the POI).

Commerce justifies this rigid time limit by first claiming that the statute does not specify a time period under which uncollected duties should be considered. *Id.* at 43. As noted above, the statute's requirement that Commerce reduce a respondent's export price be increased by the *full* amount of duties even where they are rebated

after the fact precludes Commerce's reading that the statute can reasonably be read to impose a strict temporal time limit on the perfection of the import duty exemption reflected in the Turkish IPR regime.

Commerce acknowledges that, under the Turkish IPR regime, no import duty is imposed upon importation. *See id.* at 42. Instead, it acknowledged that the duty liability is extinguished upon IPC closure. *See id.* (reasoning that benefits did not accrue to respondents during the POI where IPCs did not close during the POI because respondents remained liable for duties foregone under those IPC until after the POI). But, based on Commerce's own description of the IPR, Commerce cannot reasonably conclude that a respondent remained liable for import duties under IPCs that the record shows were actually closed. If a respondent is no longer liable for import duties for subject merchandise that YDC has linked to the same closed IPC, then the statute requires the respondent's export price to be increased by the amount of import duties that were not collected by reason of exportation of subject merchandise to the United States. 19 U.S.C. § 1671(c)(1)(B).

Case 1:26-cv-00722-JCG   Document 51-2   Filed 07/10/26   Page 46 of 66

Consol. Case No. 26-00722                    NON-CONFIDENTIAL
                                                   VERSION

Commerce offers no reasoned analysis for why IPC closure during the POI is necessary to conclude that import duties were not collected by reason of exportation of the subject merchandise to the United States. In fact, the identical justifications for the POI closure limitation articulated by Commerce were previously rejected by the Court as unreasonable and arbitrary. *See Tosçelik*, 348 F.Supp.3d at 1326 (holding that "Commerce's imposition of a POI limitation unreasonably undercuts its stated goals of accuracy, transparency, and predictability").

First, Commerce claims that limiting the duty drawback adjustment to IPCs closed during the POI is consistent with its practice in other aspects of its dumping calculation such as collecting cost of production ("COP") data for the POI, as opposed to pre-POI COP data, even though companies may have produced the subject merchandise sold during the POI in periods prior to the POI. Final Decision Memo at 43. The Court correctly rejected the notion that Commerce consistently adheres to calculating all costs and expenses solely based on those that are accounted for during the POI. *See Tosçelik*, 348 F.Supp.3d at 1327.

Case 1:26-cv-00722-JCG    Document 51-2    Filed 07/10/26    Page 47 of 66

Consol. Case No. 26-00722                           NON-CONFIDENTIAL
                                                              VERSION

For example, Commerce does not even limit sales reporting to the POI. In administrative reviews, Commerce always requires respondents to report home market sales outside the POR to allow matches for U.S. sales 90 days before and 60 days after the date of U.S. sale. *See* 19 C.F.R. § 351.414(f) (stating that, where normal value cannot be compared with export price during the first month following the month in which a particular U.S. sale was made because there were no such sales during the same month, Commerce will compare the normal value to the most recent of three months prior to the month of the U.S. sale in which there was a sale of the foreign like product or the earlier of two months following the month of the U.S. sale in which there was a sale of the foreign like product).

Even in the context of COP, as cited in Commerce's final determination, Commerce relies on ratios for general and administrative ("G&A") expenses and INTEX from the full fiscal year closed in the period of review. *See* Memorandum to Heidi K. Schriefer Supervisory Accountant, re: "Cost of Production and Constructed Value Calculation Adjustments for the Final Determination – Yildiz Entegre Agac Sanayi ve Ticaret A.S. and Yildiz Entegre Agac Sanayi ve Ticaret

Case 1:26-cv-00722-JCG    Document 51-2    Filed 07/10/26    Page 48 of 66

Consol. Case No. 26-00722                    NON-CONFIDENTIAL
                                                        VERSION

A.S" (Aug. 25, 2025), C.R. 589, P.R. 360 (relying upon the COP

information submitted by YDC for the final determination except for a

recalculation of the costs of goods sold denominators to the general and

administrative and interest expense ratios to include reclassified costs);

*see also* Letter from Trade Resources Company, re: "Section D

Questionnaire response" (Dec. 23, 2024), C.R. 113, P.R. 139–140, at D-

31 (stating that general and administrative and interest expenses are

reported based on the fiscal year 2023, not costs incurred during the

POI).

Commerce also requires respondents to report each field in their

reported databases based on the nature of the revenue or expense to

determine whether it should be reported on a POI basis or on some

other basis. Commerce recognized that the drawback period covered by

an IPC is unrelated to a respondent's fiscal year or to the POI/POR, but

rather to the date of the first importation under the IPC, and

extendable up to an additional three months. *See* Final Decision Memo

at 42. Since the time frame within import duty exemptions are

perfected under the IPR bears no relationship to POI expenses, there is

no reasonable basis for Commerce to require IPC closure during the

POI. The Court agreed that this justification is inadequate to justify Commerce's POI closure limitation because Commerce does not consistently treat costs and expenses "depends on the <u>nature</u> of the expense, rather than a consistent imagined adherence to calculating all costs solely that occur and are accounted for in the POI." *See Tosçelik*, 348 F.Supp.3d at 1327.

Moreover, Commerce's claim that it is appropriate to limit drawback duties to amounts earned during the POI because the transactions relate to duties on imported raw materials—which are among the costs included in COP—ignores the reality of the IPR, which exempts import duties upon importation and merely perfects that exemption upon closure. *See* Final Decision Memo at 43. In other words, YDC never pays duties on imports under an IPC closed during the POR.

Moreover, the duty drawback adjustment is an adjustment to U.S. price, not to costs. Further, raw materials consumed in the POI may, or may not, have been imported under the IPCs used, opened, or closed during the POI. Therefore, Commerce failed to explain the logical linkage between IPC closure and YDC's costs, particularly since duties

that were exempted would not show up in its accounting system in the first instance.

YDC calculates its costs in its own accounting system, but IPC accounting takes place in the data systems of Turkish customs in relation to opening and closing dates of individual IPCs. For the same reason, Commerce's justification for the POI cut-off point as necessary to ensure some relationship between price setting behavior and costs fails. *See* Final Decision Memo at 44. Requiring that an IPC be used during the POI, that use be completed during the POI, and that the GOT issue its final approval letter during the POI is unreasonable given that the POI is, by definition, one-year and the average validity period for an IPC is 18 months, with final approval from the GOT taking up to an additional 3-4 years. *See* Final Decision Memo at 40.

Since Commerce acknowledges that IPCs cannot be changed after the IPC modification period expired, *id.* at 42, Commerce lacks any basis in the record to conclude that later closure could call into question the accuracy of reported importations of subject merchandise linked to an IPC closed after the end of the POI. The POI IPC closure date is arbitrary because it bears no relationship to determining whether

Case 1:26-cv-00722-JCG   Document 51-2   Filed 07/10/26   Page 51 of 66

Consol. Case No. 26-00722                    NON-CONFIDENTIAL
                                                        VERSION

duties are exempted by reason of exportation of subject merchandise to the United States or to the date that liability for import duties is extinguished.

Second, Commerce claims that the fixed POI cut-off date promotes administrability of dumping proceedings by permitting Commerce to evaluate the sufficiency and accuracy of data early enough in a particular segment to notify respondents of data deficiencies and provides predictability and transparency in administering duty drawback claims. Final Decision Memo at 44. The Court has dismissed materially identical concerns where Commerce verified the usage and closure of IPCs that were timely placed on the record, including those that closed after the end of the POI. *See Tosçelik*, 348 F.Supp.3d at 1327. Here, as in the *Tosçelik*, YDC timely submitted information regarding closure of all three IPCs in response to Commerce's supplemental questionnaire while explaining that the three IPCs were all closed by the GOT after submission of its Section C questionnaire. YDC presented evidence of official validation and closure of the three IPCs and a list of realized exportations under the closed IPCs, a revised duty drawback calculation worksheet, and calculating the per-unit sales

44

side adjustment for all U.S. sales imported under the closed IPCs. *See*

YDC Supp. C QR, C.R. 215–231, P.R. 216, at Exs. S4-23, S4-24.

The Court considered and rejected the notion that predictability or transparency is served by denying a duty drawback adjustment whose accuracy was not in question. *Tosçelik*, 348 F.Supp.3d at 1328. Moreover, the Court found that the imposition of the POI limitation "unreasonably undercuts its stated goals of accuracy, transparency, and predictability." *Id.*

Predictability and transparency are not the primary or exclusive goals of the antidumping law. Rather, the general and basic purpose of the statute is to calculate dumping margins as accurately as possible within the framework of the proceeding. *See Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990). As discussed above, the more specific statutory provision related to duty drawback requires Commerce to increase a respondent's export price by the amount of import duties that were not collected by reason of exportation of subject merchandise to the United States. See 19 U.S.C. § 1677a(c)(1)(B). Commerce's inconsistent application of when it will consider closed IPCs to calculate the duty drawback adjustment does not serve

predictability and transparency, and denying duty drawback to a respondent where the record shows the duty liability had been extinguished is inconsistent with the statute.

Third, Commerce claims that limiting duty drawback to IPCs closed during the POI allows Commerce to fully analyze the claims within the limited statutory time frame allotted to complete a segment of antidumping duty proceedings and eliminates the possibility of double-counting duty drawback claims in multiple segments. Final Decision Memo at 44. This concern is not supported by the record of this investigation.

YDC first identified the same three closed IPCs in its initial Section C response where it stated that one IPC was open and the other was under closure (i.e., pending official approval documentation from the GOT) along with a duty drawback calculation to support the calculation of the duty drawback adjustment. *See* Letter from Trade Resources Company, re: "Section C Questionnaire Response" (Dec. 13, 2024), C.R. 46–73, P.R. 131, at 36, Ex. C-17 ("YDC Section C QR") (containing YDC's duty drawback calculation related to imports of subject merchandise under the IPCs that were not yet closed). Already aware of

the open status of YDC's IPCs as of the date YDC submitted its initial Section C questionnaire response (i.e., well after the end of the POI), Commerce nevertheless asked YDC to update the duty drawback field of its U.S. sales database to reflect "any additional {IPC} closures *since the time of your initial submission*." Letter to Yildiz Demir Çelik Sanayi A.S., re: "YDÇ Section C Supplemental Questionnaire" (Mar. 10, 2025), C.R. 191, P.R. 199, at Attach. at 3. If Commerce had a strict and uniform policy of never considering IPCs that were closed after the POI, why would it ever consider asking YDC to update its duty drawback to reflect IPC closed since its initial submission, which was already past the end of the POI?

The fact that Commerce requested updated duty drawback calculations to reflect closures of IPCs since its initial submission shows that Commerce believed it had adequate time remaining to complete the information and evaluate YDC's duty drawback claim even though it knew that YDC could not possibly have reported the IPCs identified as open earlier in the proceeding as closed during the POI.

Moreover, Commerce did not deny YDC a duty drawback adjustment based on its inability to verify the reported information or inadequate

47

Case 1:26-cv-00722-JCG    Document 51-2    Filed 07/10/26    Page 55 of 66

Consol. Case No. 26-00722                    NON-CONFIDENTIAL
                                                      VERSION

time remaining to do so. It did not question the accuracy of YDC's duty drawback calculation at all. Rather, Commerce refused to even consider or verify the accuracy of YDC's duty drawback calculation because it found that YDC had no IPCs that closed within the POI limitation. *See* Final Decision Memo at 41 (limiting Commerce's analysis to only POI-closed IPCs because if found that none of YDC's IPCs had closed within that period); *see also* Memorandum to The File, re: "Denial of Request for Reconsideration (Apr. 4, 2025), P.R. 231 (declining to reconsider its determination not to include verification of duty drawback information reported and stating that YDC is not precluded from presenting arguments in its case briefs). The record, therefore, does not support that Commerce's denial stemmed from concerns about the practicability or time frame remaining in the investigation to fully verify the duty drawback reported by YDC.

Rather, Commerce applied the blanket POI time limitation without considering whether it could verify the amount of import duties that had not been collected in this administrative review. It is not reasonable to have a strict POI closure limitation to serve administrability when the number of closed IPCs reported by a

Case 1:26-cv-00722-JCG    Document 51-2    Filed 07/10/26    Page 56 of 66

Consol. Case No. 26-00722                     NON-CONFIDENTIAL
                                                         VERSION

respondent could vary from case to case. For example, would it be more practicable for Commerce to verify 10 IPCs closed during the POI or a single IPC that closed before submission of the Section C questionnaire response? This question alone demonstrates the arbitrariness of Commerce's cut-off date.

In addition, under Commerce's strict temporal cut-off rule, whether a respondent will receive drawback would depend on such vagaries as the timing of respondent selection and of initiation of an administrative review, which are factors over which a respondent lacks any control. Commerce's approach undermines the remedial purpose of the statute because it deprives the respondent of any control of whether or not its U.S. price is adjusted. There are no steps a respondent can take to protect itself from the adverse effects of delayed IPC closure, which makes Commerce's approach arbitrary and punitive.

Fourth, Commerce claim that the POI cut-off date prevents possible double counting is similarly meritless. *See* Final Decision Memo at 44 (claiming that limiting the duty drawback calculation to IPCs that closed as of the POI eliminates the possibility of double counting claims in multiple segments). YDC reported a ratio of duties rebated to

quantity exported on each closed IPC. *See* YDC Section C QR, C.R. 46–73, P.R. 131, at Ex. C-17, YDC Supp. C QR, C.R. 215–231, at Ex. S4-23. That ratio does not change if the IPC is included in more than a single separate period or proceeding. In other words, the duty drawback adjustment is, by its nature, an allocation. As a result, the idea that duty drawback could be double-counted from one period to another is not a credible justification for Commerce's practice.

Rather, in each segment, Commerce inquires whether the respondent's IPC had exports of subject merchandise during that segment. If it did and the record indicates the IPC is closed, then the IPC can be used to calculate duty drawback for the amount of duties tied to exports of subject merchandise under that closed IPC. Whether or not an IPC extends long enough to cover two separate proceedings, a respondent would only be entitled to duty drawback if it could demonstrate it had exports of subject merchandise to the U.S. linked to the same IPC. If subject merchandise exported to the United States during a given period received drawback, it is entitled to the adjustment to U.S. price, but granting the adjustment in one segment does not foreclose granting the same adjustment in the next segment.

50

Nothing is being double counted because the exports linked to the closed IPC can only fall within the time frame of a single period based on the date of sale. The Court easily dismissed materially identical concerns because it found that IPCs simply cannot be double counted from one segment to the next because of the nature of the duty drawback calculation. *See Tosçelik*, 348 F.Supp.3d at 1328 (dismissing the notion that a duty drawback ratio could be exhausted by its having been reported in a given segment because exports that are in different administrative review period that occur on the same IPC are nevertheless entitled to the same adjustment).

For all these reasons, Commerce's imposition of the POI limitation on IPC closure is unreasonable, arbitrary, and unlawful. Commerce's rule is not reasonably tied to the inquiry required by the statute (i.e., linking imported duty exemptions to imported subject merchandise) or to any of the predictability, administrability, or transparency concerns identified by Commerce.  Therefore, the Court should direct Commerce to grant YDC a duty drawback adjustment based on the IPCs it demonstrated were closed.

51

Case 1:26-cv-00722-JCG     Document 51-2     Filed 07/10/26     Page 59 of 66

**Consol. Case No. 26-00722**                    **NON-CONFIDENTIAL**
                                                              **VERSION**

II. Commerce's Calculation of YDC's Interest Expense Ratio by Including YEs Net Monetary Is Unlawful and Not Supported by Substantial Evidence

In the Final Determination, Commerce continued to unlawfully include the net monetary loss in its calculation of YDÇ's INTEX ratio. Final Decision Memo at 25, P.R. 354. The monetary loss reflects an adjustment of the historical figures in the statutory books and records to current inflation adjusted level. *See* YDC Cost Case Br., at 13, C.R. 574, P.R. 326, *see also* Section D Supplemental Questionnaire Response, at page S3-38 to S3-39, Exhibit S3-26 (Revised Ex D21), C.R. 282, 290, and 301, P.R. 218. As such, the monetary gain/loss includes the impact of prior years in addition to the current fiscal year. Commerce's questionnaire specifically instructs only period expenses should be included in the reported cost of production. *See* High Inflation Section D Questionnaire, at page D-21, P.R. 108 (Nov. 15, 2024). Consequently, the non-period, non-financial expenses cannot be considered as period financial expenses and should therefore have been excluded.

In the Final Determination, Commerce cited *Salmon from Chile* to explain why and how it includes monetary gains and losses as a part of interest expense. Final Decision Memo, at 26. While Commerce adopted

52

NON-CONFIDENTIAL
                                                            VERSION

and followed the reasoning described in *Salmon from Chile* for
including monetary gains and losses as a part of interest expense,
Commerce ignored its practice with regard to how it is to include
certain of those gains and losses in the INTEX ratio.

In *Salmon from Chile*, Commerce explained that "we have included
only the amount related to *current* monetary assets and monetary
liabilities." *See Notice of Final Results of Antidumping Duty
Administrative Review: Fresh Atlantic Salmon from Chile*, 65 Fed. Reg.
87472, (Dec. 15, 2000) and accompanying Issues and Decision
Memorandum, Comment 1, (Barcode 4778946-01) (emphasis added),
*citing Notice of Final Determination of Sales at Less Than Fair Value:
Emulsion Styrene-Butadiene Rubber From Mexico,* 64 Fed. Reg. 14872,
14882 (Mar. 29, 1999) ("*ESBR from Mexico*").  In *ESBR from Mexico*,
Commerce explained,

> "it reasonable to include in the interest expense computation
> the impact of holding monetary assets and liabilities
> throughout the year. Even though Negromex normally
> computes its net gain or loss on monetary position using all
> monetary assets and liabilities (both current and long-term),
> we computed the net gain amount using only Negromex's
> current monetary assets and liabilities."

*ESBR from Mexico*, 64 Fed. Reg, at 14882.

53

Case 1:26-cv-00722-JCG    Document 51-2    Filed 07/10/26    Page 61 of 66

Consol. Case No. 26-00722                    NON-CONFIDENTIAL
                                                      VERSION

Commerce went on to explain that this practice is consistent with how it determines the amount of foreign exchange gain or loss to include in the interest expense calculation and noting that "to only include the current portion of the foreign exchange gains or losses related to debt but to include the entire gain or loss on monetary position would be unreasonable and distortive." *Id.*

In *Salmon from Chile*, Commerce followed the same approach first described in *ESBR from Mexico. See Salmon from Chile*, IDM, Comment 1, (Barcode 4778946-01). Yet, in the calculation of interest expense for YDC, Commerce ignored this aspect of its practice and included adjustments made to long-term accounts and to non-monetary or finance related accounts.

YDC argued in its case brief that Commerce, if it was not going to exclude monetary gain or loss entirely, must at least revise its calculation of INTEX to exclude the long-term and non-financing components from the adjustment. *See* YDC Cost Case Br. at 14, C.R. 574, P.R. 326. The information to adjust the interest expense calculation to limit to current financial and interest expense was included in Exhibit S3-26. *Id., see also*, Section D Supplemental

Questionnaire Response, at page S3-38 to S3-39, Exhibit S3-26 (Revised

Ex D21), (Mar. 24, 2025), C.R. 282, 290, and 301, P.R. 218. Therein,

YDC demonstrated that only [███] percent of the total monetary loss in

the statutory financial statements related to current financial income or

expense. *Id.*  Moreover, the categorization of the individual line-items

comprising the monetary loss was supported by an affidavit and

worksheet from YDC's outside auditor and Commerce examined both

the auditor's statement and the auditor's worksheet included at Exhibit

S3-26 during verification. *See* Verification of the Cost Response of YDC,

at 14, (Jul. 9, 2025), C.R. 540, P.R. 313; *see also* YDC Cost Verification

Exhibits, Exhibit CVE-9, (May 21, 2025), C.R. 498, P.R. 305.

Had Commerce followed its practice to include only current monetary

and financial assets and liabilities in its calculation of interest expense,

Commerce would have excluded nearly all of the net monetary loss

booked in the statutory financial statements of YDC's parent company,

YE. For example, the adjustment that Commerce used included

Accumulated Depreciation and Plant, Machinery, and Equipment, each

nearly 20 million Turkish lira and the largest line items included in the

adjustment. *See* YDC Cost Verification Exhibits, Exhibit CVE-9, (May

21, 2025), C.R. 498, P.R. 305, and Section D Supplemental

Questionnaire Response, at page S3-38 to S3-39, Exhibit S3-26 (Revised

Ex D21), (Mar. 24, 2025), C.R. 282, 290, and 301, P.R. 218.

These adjustments applied by Commerce reflect neither current

expenses or liabilities nor financial or monetary assets or liabilities that

relate to interest expense. Commerce's determination to include non-

current expenses in the INTEX ratio conflicts with Commerce's practice

in *Salmon from Chile* and *ESBR from Mexico*. Accordingly, Commerce's

interest expense calculation must be revised as not in accordance with

law and otherwise not supported by substantial evidence and should be

limited only to the items identified by the outside auditor as relating to

financial income or expense.

**Consol. Case No. 26-00722**                    **NON-CONFIDENTIAL**
                                                        **VERSION**

## III.    CONCLUSION

For the reasons set forth above, the *Final Determination* issued by Commerce is contrary to law and are not supported by substantial evidence. Therefore, Plaintiffs respectfully request that the Court reverse and remand this case to Commerce with instructions to recalculate YDC's antidumping duty rate including an upward adjustment to export price to reflect the amount of duties exempted by YDC's closed IPCs and to adjust YDC's interest expense ratio to exclude YE's net monetary loss in accordance with the Court's opinion in this action.

Respectfully submitted,

/s/ Kenneth N. Hammer
Jonathan M. Freed
Kenneth N. Hammer
Aqmar Rahman

**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C.  20003
(202) 223-3760

Counsel to *Consolidated Plaintiffs*
*Yildiz Demir Çelik Sanayi A.Ş. and*
*Yildiz Entegre AGAÇ Sanayi ve*
*Ticarat A.Ş.*

Dated:      July 10, 2026

# THE UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| BORÇELIK ÇELIK SANAYII TICARET A.Ş. ET AL., <br><br>         Plaintiffs and Consolidated Plaintiffs, <br><br>     v. <br><br> UNITED STATES, <br><br>         Defendant, <br><br>    and <br><br> STEEL DYNAMICS INC. ET AL., <br><br>         Defendant-Intervenors and Consolidated Defendant-Intervenors. | Consol. Court No. 26-00722 <br><br> Before:    Hon. Jennifer Choe-Groves, Judge |

## CERTIFICATE OF COMPLIANCE

The undersigned counsel at Trade Pacific PLLC hereby certifies that the Memorandum of Law in Support of Consolidated Plaintiffs' Motion for Judgment Upon the Agency Record, dated July 10, 2026, complies with the word-count limitation described in the Standard Chambers Procedures. The memorandum of law contains 10,581 words according

to the word-count function of the word-processing software used to

prepare the memorandum.

                        Respectfully submitted,

                        /s/ Kenneth N. Hammer
                        Kenneth N. Hammer

                        TRADE PACIFIC PLLC
                        700 Pennsylvania Avenue, SE
                        Suite 500
                        Washington, D.C.  20003
                        (202) 223-3760

Dated:  July 10, 2026